JAMES FISCHER AND GENEVA FISCHER, PLAINTIFFS-RESPONDENTS, v. JOHNS–MANVILLE CORPORATION, JOHNS-MANVILLE PRODUCTS CORPORATION, JOHNS-MANVILLE SALES CORPORATION, CANADIAN JOHNS-MANVILLE ASBESTOS, LTD., CANADIAN JOHNS-MANVILLE CO., LTD., CANADIAN JOHNS-MANVILLE MINING COMPANY, LTD., DEFENDANTS-APPELLANTS, AND BELL ASBESTOS MINES, LTD., DEFENDANT.

Argued November 5, 1984—Decided July 31, 1986.

644

646

*David R. Gross* argued the cause for appellants (*Budd, Larner, Kent, Gross, Picillo & Rosenblum,* attorneys; *David J. Novak,* of counsel; *Sebastian P. Lombardi,* on the brief).

*Karl Asch* argued the cause for respondents (*Ronald S. Suss*, on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

Plaintiff James Fischer and Geneva Fischer, his wife, brought suit against multiple defendants seeking to recover damages for lung diseases suffered by James Fischer as a result of his exposure to asbestos. The complaint sought compensatory and punitive damages from defendants-suppliers of asbestos under negligence, breach of warranty, and strict products liability theories. Plaintiffs elected to press at trial only the strict liability cause of action for compensatory damages, while at the same time they sought punitive damages. There were dismissals of numerous defendants before and during trial, leaving at the close of trial only the Johns-Manville defendants [1] (hereinafter Johns-Manville or defendant) and Bell Asbestos Mines, Ltd. (Bell).

The case was tried to a jury. At the close of trial, the jury awarded compensatory damages of $86,000 to James Fischer and $5,000 to Geneva Fischer. The jury found Johns-Manville eighty percent liable and Bell twenty percent liable. The jury also awarded James Fischer $300,000 in punitive damages, of which $240,000 was assessed against Johns-Manville and $60,-000 against Bell. Both defendants appealed and the Appellate Division affirmed in its entirety the judgment of the trial court. 193 *N.J.Super.* 113 (1984).

---

[1]"Johns-Manville defendants" includes Johns-Manville Corporation; Johns Manville Sales Corporation, successor to and in lieu of Johns-Manville Products Corporation; Johns-Manville Canada, Inc., formerly known as Canadian Johns-Manville Co., Ltd.; and Johns-Manville Amiante Canada, Inc., formerly known as Canadian Johns-Manville Asbestos, Ltd. After the start of this suit, Johns-Manville Canada, Inc. and Johns-Manville Amiante Canada, Inc. changed their names to JM Asbestos, Inc. and 126692 Canada, Inc., respectively, and thereafter were amalgamated with a third corporation. The resultant corporation now conducts business under the name of JM Asbestos, Inc.

In the court below Johns-Manville did not dispute the award of compensatory damages, nor did it "challenge either the amount of the punitive damages allowed or the trial judge's instructions respecting the standards which the jury was to apply in considering an award of punitive damages." 193 *N.J.Super.* at 120. Rather the contentions were that punitive damages are "not allowable at all" in strict product liability actions, *ibid*, and that even if they are, the proofs were inadequate to meet the necessary standard of "outrageous conduct in deliberate disregard of the rights of others," *ibid*, both of which contentions the Appellate Division rejected.

We granted certification, 97 *N.J.* 598 (1984), after which defendant Bell withdrew its appeal. In addition to its general argument that the case before us is one of great public importance, Johns-Manville's petition urges that the Appellate Division's determination runs counter to decisions by New Jersey federal district courts and thus requires clarification. As well it repeats the arguments made below, that (1) punitive damages "cannot conceptually flow" from a claim based on strict liability for failure to warn, (2) punitive damages "serve no purpose" in asbestos mass litigation, and (3) the record does not support a finding of punitive damages against Johns-Manville. As did the Appellate Division, we reject those contentions. We therefore affirm.

### I

A full understanding of the background of this case requires a fairly extensive repetition of the pertinent facts set out in Judge Pressler's comprehensive opinion for the Appellate Division.

James Fischer worked for Asbestos Limited in Millington, Morris County, from 1938 until 1942, and then again in 1945. During his employment his varied duties included bagging asbestos fiber, grinding asbestos ore into fiber, and mixing asbestos fibers with other materials for the manufacture of

insulation materials. From 1942 through 1945 and from 1946 through 1947 Fischer toiled as a farm worker; in 1947 he took employment with National Starch Chemical Company in Plainfield. His only exposure to asbestos was while working at Asbestos Limited. During that time he received no cautionary warnings about any dangers of asbestos, nor was he instructed in the safe handling of asbestos by either his employer or the suppliers of asbestos materials, identified at trial as Johns-Manville and Bell.

Fischer suspected that he might be suffering from asbestos-related problems when in 1977 his pulmonary disease first manifested itself. His suspicions were confirmed in 1978, at which time he was given medication that ultimately produced such side effects as diabetes, rheumatoid arthritis, and osteoporosis. His progress thereafter continued downhill: in 1979 he entered the hospital for treatment of bronchitis with borderline pneumonia; although he returned to work thereafter, he experienced a heart attack in February 1980, when he was 61 years old. He has not worked since. His treating physician attributed his total disability as due 30% to chronic obstructive lung disease traceable to smoking, 60% to asbestos exposure and the side effects of the medication prescribed for pulmonary problems, and 10% to the heart condition.

The Appellate Division, focusing on what Johns-Manville knew and when it knew it, narrowed the issue to defendant's "actual knowledge." 193 *N.J.Super.* at 117. It viewed the "essential controversy" as whether defendants "did in fact have knowledge of the hazards of asbestos during the time of plaintiff's exposure some 45 years ago"—"essential," because plaintiffs' punitive damage claim hinged on their contention that "defendants knew of these hazards as early as the 1930's and had made a conscious business decision to withhold this information from the public." *Ibid.* In particular, plaintiffs contended that defendants, "with full knowledge of the risks, deliberately chose not to give those warnings to users of the product, which might have enabled them to obtain protection

from prolonged exposure." *Ibid.* It was this conduct that plaintiffs labelled as "outrageous and flagrant," in disregard of "the substantial health risks to which defendants subjected the public * * *." That conduct therefore "justified the imposition of punitive damages." *Ibid.*

The Appellate Division summarized the evidence in support of those allegations as follows.

Johns-Manville, in its answers to interrogatories, which were read to the jury, admitted that

[t]he corporation became aware of the relationship between asbestos and the disease known as asbestosis among workers involved in mining, milling and manufacturing operations and exposed to high levels of virtually 100% raw asbestos fibers over long periods of time by the early 1930s. The corporation has followed and become aware of the general state of the medical art relative to asbestos and its relationship to disease processes, if any.

In response to plaintiffs' requests for admissions, also read to the jury, it admitted that in the early 1940's it knew that asbestos "was dangerous to the health" of those industrial workers who were exposed to excessive amounts of the material. Plaintiffs, moreover, produced as a witness Dr. Daniel C. Braun, president of the Industrial Health Foundation, a research organization which develops, accumulates and disseminates information about occupational diseases. Dr. Braun testified that Johns-Manville has been a member of the Foundation since 1936. He also testified that since 1937 the Foundation has sent to its members a monthly digest of articles appearing in scientific journals which relate to occupational disease. Relevant portions of the digests, which were admitted into evidence, included references to eleven scientific articles published between 1936 and 1941 documenting the grave pulmonary hazards of exposure to asbestos and discussing measures which could be taken to protect workers. Plaintiffs also proved that as early as 1933 claims were being made against Johns-Manville by asbestos workers, and in November of that year the Executive Committee of its Board of Directors passed a resolution authorizing the president of the corporation

to enter into negotiations for the settlement of any actions now pending or which may be hereafter brought against the Corporation by former employees founded upon alleged injury or disease resulting from their employment by the Corporation and, in his discretion, to settle any such cases upon such terms as he shall, in his uncontrolled discretion, deem advisable and for the best interest of the Corporation.

In December of that year high-level representatives of Johns-Manville met with officials of Raybestos-Manhattan, another major asbestos supplier, to discuss steps which the industry as a whole might take to reduce employee risk. It appears, however, that Johns-Manville never did arrange for or participate in any industry-wide meetings on the subject. The minutes of that 1933 meeting

also confirm the participants' view that at least for the time being "our past policy of keeping this matter confidential is to be pursued."

Perhaps most damning of all is the so-called Sumner Simpson correspondence of 1935 and 1941. Simpson was president of Raybestos. In October 1935, he received a letter from a Miss Rossiter, editor of the trade periodical *Asbestos*, suggesting that despite Simpson's earlier requests, made "for certain obvious reasons," that articles relating to asbestosis not be published, perhaps the time had come to print a positive article about industry efforts to reduce the risk in order "to combat some of the rather undesirable publicity given to it [asbestosis] in current newspapers." Simpson thereupon sent a copy of the letter to Johns-Manville's secretary, Vandiver Brown, expressing his opinion that "the less said about asbestos, the better off we are." Brown's reply stated in part:

> I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity. Even if we should eventually decide to raise no objection to the publication of an article on asbestosis in the magazine in question, I think we should warn the editors to use American data on the subject rather than English. Dr. Lanza has frequently remarked, to me personally and in some of his papers, that the clinical picture presented in North American localities where there is an asbestos dust hazard is considerably milder than that reported in England and South Africa.

Some seven years later, in 1941, Brown wrote to Simpson regarding Miss Rossiter's proposal to include in a forthcoming issue of *Asbestos* a review of a book apparently linking asbestos exposure with pneumoconiosis. Noting that "a number of her subscribers would dislike an article on this subject in the trade magazine of the Asbestos Industry," Brown expressed the view that as a result of his communications with Miss Rossiter, "I am inclined to believe she will omit any review of the book in question."

> Finally, plaintiffs' attorney read into evidence excerpts of the deposition testimony of Kenneth W. Smith, a physician who started to work for Johns-Manville in 1944 and eventually became Medical Director of its Canadian corporation. Dr. Smith testified that from the beginning of his employment he saw persons with asbestosis "on a regular and frequent basis" and frequently made recommendations that such employees receive job reclassifications which would remove them from continued exposure to asbestos dust. [193 *N.J.Super.* at 117–20.]

The court below held that in respect of the punitive damages claim, the proofs recited above fully supported plaintiffs' factual contentions and the jury's acceptance of them. 193 *N.J.Super.* at 117. On this appeal Johns-Manville's position, succinctly stated, is that the punitive damages award against it is legally impermissible, ill-advised as a matter of public policy in litigation of this nature, and factually unwarranted.

## II

■ The "legally impermissible" argument rests on an asserted theoretical inconsistency between strict liability and punitive damages, which would preclude punitive damage claims when liability for compensatory damages is founded on strict products liability doctrine, if not in all situations at least in asbestos, strict liability lawsuits. We hold that there is no *per se* legal bar to pursuing a strict liability, failure-to-warn claim and a punitive damage claim in the same case. For this purpose there is no reason to distinguish asbestos litigation from other strict products liability actions. A brief examination of the development and purposes of strict products liability and punitive damages may illuminate the nature of their differences and clarify our holding that those differences do not create a bar to an award of punitive damages in a failure-to-warn, strict products liability case.

We trace current notions of strict products liability both to principles of warranty, a "freak hybrid born of the illicit intercourse of tort and contract," Prosser, "The Assault Upon The Citadel," 69 *Yale L.J.* 1099, 1126 (1960), and to tort strict-liability theory, found primarily in cases involving trespass or nuisance. For personal injuries arising from a breach of warranty, "strict liability is imposed upon the maker or seller of the product. Recovery of damages does not depend upon proof of negligence or knowledge of the defect." *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 372 (1960). For its part, strict liability in tort rests on the notion that certain activities that create danger must, regardless of their reasonableness, "pay [their] own way in the event [they] actually cause[ ] damage[ ] to others." *Berg v. Reaction Motors Div.*, 37 *N.J.* 396, 410 (1962).

From these beginnings there evolved the doctrine of strict products liability as we know it today. The doctrine of strict liability in tort imposes liability for injury to another's person or property without any consideration of the defendant's intent to

commit the act or cause the injury, or of his moral blameworthiness. Although strict liability in tort has sometimes been referred to as "liability without fault," the expression "liability without moral blame" is more accurate. The "moral blame" connotation given to fault in the criminal law has little application in the law of torts. "There is a broader sense in which 'fault' means nothing more than a departure from a standard of conduct required of a person by society for the protection of his neighbors." W. Prosser and W. Keeton, *The Law of Torts* 535 (5th ed. 1984), *quoted in Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 162 (1979).

> [The] contention that liability in strict tort precludes consideration of a defendant manufacturer's fault is highly dubious. In fact, rather than dispensing with the notion of fault from products liability law, strict tort theory expands it by extending the legal consequences of fault to the "innocent" manufacture of defective products in a manner analogous to negligence per se.
>
> [Owen, "Punitive Damages in Products Liability Litigation," 74 *Mich.L.Rev.* 1257, 1269 (1976) (footnotes omitted) (hereinafter *Owen I*).]

We have previously held that a defendant found liable under strict products liability theory will be considered at fault for purposes of applying the Joint Tortfeasors Contribution Law, *N.J.S.A.* 2A:53A–1 to –5. *Suter, supra,* 81 *N.J.* at 162–63; *see also Cartel Capital Corp. v. Fireco of New Jersey,* 81 *N.J.* 548, 566–67, 570 (1980) (total relevant fault was that of two defendants, one liable for production and distribution of a defective product, one liable for its negligent servicing of the product and its role in the chain of distribution).

Although the emphasis in strict products liability cases is on the safety of the product rather than on the manufacturer's conduct, *e.g., Feldman v. Lederle Labs.,* 97 *N.J.* 429, 450 (1984), when, as here, the defect in the product consists of a failure to warn (specifically, defendant's failure to warn plaintiff James Fischer of the dangers in working with the asbestos ore and fiber that Johns-Manville supplied to Fischer's employer), "reasonableness of the defendant's conduct is a factor in determining liability." *Id.* at 451. But the appraisal of that reasonable-

ness is made, in a failure-to-warn case, on the basis of a hypothetical element, an assumed fact. As *Feldman* explains,

[t]he question in strict liability design-defect and warning cases is whether, *assuming that the manufacturer knew of the defect in the product,* he acted in a reasonably prudent manner in marketing the product or in providing the warnings given. Thus, *once the defendant's knowledge of the defect is imputed,* strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct. [97 *N.J.* at 450 (emphasis added).]

The quoted passage both demonstrates the limited extent to which negligence analysis creeps into our failure-to-warn, strict products liability law, and illuminates the contrasting approaches of strict liability and negligence theories. As trenchantly observed in *Freund v. Cellofilm Properties, Inc.,* 87 *N.J.* 229 (1981), in the course of Justice Handler's exegesis on the difference between the two approaches, "under strict liability, the seller's knowledge [of the product's propensity to injure as it did] is presumed * * *. In negligence cases, such knowledge must be proved; the standard is what the manufacturer 'knew or should have known.' " *Id.* at 239 (quoting *Phillips v. Kimwood Mach. Co.,* 269 *Or.* 485, 525 *P.* 2d 1033 (1974)). *See also O'Brien v. Muskin Corp.,* 94 *N.J.* 169, 181–84 (1983) (risk-utility analysis to evaluate product's safety is sometimes phrased to inquire whether reasonable manufacturer, fully aware of dangers posed by product, would have manufactured and marketed it as he did).

As is obvious from the foregoing, although juries are asked in failure-to-warn cases to assess the reasonableness of a defendant's conduct, to prove a *prima facie* case of strict products liability a plaintiff need not introduce evidence relating to a manufacturer's or distributor's conduct, except to establish that the defendant did in fact put the offending article into the stream of commerce. This is in contrast to the quality of proofs required to establish a claim for punitive damages, in which a great deal must be shown about a defendant's conduct. "Punitive or exemplary damages are sums awarded apart from compensatory damages and are assessed when the wrongdoer's

conduct is especially egregious." *Leimgruber v. Claridge Associates, Ltd.,* 73 *N.J.* 450, 454 (1977); *see also Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 48 (1984) (quoting *Leimgruber v. Claridge Assocs., supra*); *Restatement (Second) of Torts* § 908(1) (1979) (punitive damages awarded for outrageous conduct).

The type of conduct that will warrant an award of punitive damages has been described in various ways. The conduct must be "wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-minded act' or an act accompanied by a wanton and willful disregard of the rights of another." *Nappe, supra,* 97 *N.J.* at 49 (citations omitted). "[T]he requirement may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg v. Reaction Motors, supra,* 37 *N.J.* at 414. However one describes the conduct that will justify punitive damages, one thing is clear: "The key to the right to punitive damages is the wrongfulness of the intentional act." *Nappe, supra,* 97 *N.J.* at 49.

As should now be apparent, the proofs needed to establish a *prima facie* case of failure-to-warn, strict products liability differ markedly from the proofs that will support an award of punitive damages. Despite their differences—one going to the theory of liability, the other bearing on the form and extent of relief—they are not mutually exclusive nor even incompatible. There is no reason they cannot be litigated together. We agree with defendant's premises: strict products liability proofs center on the product; punitive damages proofs center on a defendant's conduct. We reject as wholly unwarranted the conclusion defendant draws—that these differences preclude punitive damages claims in failure-to-warn, strict product liability cases.

Defendant places special reliance on our decision in *Beshada v. Johns-Manville Prods. Corp.,* 90 *N.J.* 191 (1982). In that strict-liability, failure-to-warn, asbestos case, this Court held

that the "state-of-the-art" defense was unavailable to the defendants. That defense would permit a defendant to demonstrate that given the scientific, technological, and other information available at the time of manufacture or distribution, it could not have known of the dangers of the product. *Feldman v. Lederle Labs., supra,* 97 *N.J.* at 452. Thus the effect of the "state-of-the-art" defense is to permit a defendant to rebut the presumption of knowledge of its product's harmful propensities, not by showing merely its own lack of knowledge but rather by proving the impossibility of knowledge, even by experts in the field. *Ibid.*

■ Under the holding of *Beshada* a defendant is precluded and a plaintiff is relieved, on the liability aspect of an asbestos, strict-liability, failure-to-warn case, from introducing evidence relating to a defendant's actual knowledge or the state of knowledge in the asbestos field at the time of distribution. That principle, however, does not render the evidence inadmissible for *all* purposes. Hence we hold that in a strict-liability, failure-to-warn case involving exposure to asbestos or asbestos products, plaintiffs are not precluded from introducing evidence relating to defendants' knowledge or conduct as it may be relevant to other aspects of the case, including punitive damages.

In addition to those evidential differences, strict products liability and punitive damages are different in purpose and in the policies each seeks to promote. "All civil doctrines are shaped with a view toward setting and enforcing rules of behavior.   * * *  [C]ivil law has both 'reparative' [providing money substitutes for losses] and 'admonitory' [discouraging repetition of wrongful conduct and warning others who are inclined to engage in similar conduct] functions." Mallor and Roberts, "Punitive Damages: Toward a Principled Approach," 31 *Hastings L.J.* 639, 645, 647 & n. 56 (1980) (hereinafter Mallor and Roberts).

The overriding goal of strict products liability is to protect consumers and promote product safety. Manufacturers, by the act of marketing their products, are made responsible to the public for injuries caused by those products—the "reparative" function. *See O'Brien v. Muskin Corp., supra,* 94 *N.J.* at 180. Economic policies underlie the legal theory. Manufacturers are usually the "cheapest cost-avoiders," *Suter v. San Angelo Foundry & Mach. Co., supra,* 81 *N.J.* at 173–74, and have the ability to spread the cost of losses caused by dangerous products. It is in furtherance of these policies that plaintiffs' burdens have been reduced. Plaintiffs are relieved, in strict products liability cases, of the burden of establishing defendants' negligence and knowledge or awareness of dangers.

Punitive damages, on the other hand, serve to express the community's disapproval of outrageous conduct—the "admonitory" function. Punitive damages are determined "from the perspective of the defendant rather than of the plaintiff." *Cappiello v. Ragen Precision Indus., Inc.,* 192 *N.J.Super.* 523, 532 (App.Div.1984) (quoting *Bartolo v. Boardwalk Regency Hotel Casino Inc.,* 185 *N.J.Super.* 540, 544 (Law Div. (1982)). They have been described as "a sort of hybrid between a display of ethical indignation and the imposition of a criminal fine." *Cabakov v. Thatcher,* 37 *N.J.Super.* 249, 259 (App.Div. 1955) (quoting *Haines v. Schultz,* 50 *N.J.L.* 481, 484 (Sup.Ct. 1888)). They are awarded to punish the wrongdoer, and to deter both the wrongdoer and others from similar conduct in the future. *E.g., Nappe, supra,* 97 *N.J.* at 48–49; *Leimgruber v. Claridge Assocs., supra,* 73 *N.J.* at 454. "The doctrine of punitive damages survives because it continues to serve the useful purposes of expressing society's disapproval of intolerable conduct and deterring such conduct where no other remedy would suffice." Mallor and Roberts, *supra,* 31 *Hastings L.J.* at 641.

As with the differing proofs required for strict liability and punitive damages, the policies behind them, although differing from one another, are not incompatible. We disagree with

Justice O'Hern's assertion "that there is a strong doctrinal inconsistency in permitting a punitive damages claim in an action based on strict products liability. *Post* at 677. In fact, in products liability cases we believe punitive damages can complement strict liability. One court has defined punitive damages as a "sword" to be used with the "shield" of compensation provided by strict liability. *Thiry v. Armstrong World Indus.*, 661 *P*.2d 515, 517 (Okla.1983). In some cases punitive damages will provide the incentive necessary to encourage plaintiffs to pursue a manufacturer who engages in a "deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences," *Berg, supra,* 37 *N.J.* at 414, when the compensatory award for those harmful consequences would be outweighed by prohibitive costs of litigation. *See also* W. Prosser and W. Keeton, *Law of Torts, supra,* § 2 at 12 (punitive damages can remedy denial of compensation for actual expenses of litigation and serve as an incentive to seek redress for "a long array of petty cases of outrage and oppression").

Additional support for allowing punitive damages in strict products liability actions may be found in the availability of alternative theories of liability in products cases. Plaintiffs may pursue products claims not only under principles of strict liability but also under theories of negligence or intentional tort. No one would argue that in either of the latter instances a plaintiff would be barred from seeking punitive damages. Hence to allow punitive damages in products cases based on these theories but disallow them under strict liability would create an unnecessary and unwelcome anomaly in our law. The right to recover punitive damages cannot sensibly, in this day and age, be made to turn on the form of pleading—a truism recognized by our learned judicial colleagues on the federal trial bench in New Jersey, albeit later by some than by others. *Compare Gold v. Johns-Manville Sales Corp.*, 553 *F.Supp.* 482 (D.N.J.1982) (punitive damages not allowed in a products liability action resting on failure-to-warn, strict products liability, but

allowed on negligence counts in same case), *and Wolf by Wolf v. Proctor & Gamble Co.,* 555 *F.Supp.* 613 (D.N.J.1982) (punitive damages allowed only on negligence and intentional misrepresentation claims), *with Gogol v. Johns-Manville Sales Corp.,* 595 *F.Supp.* 971 (D.N.J.1984) (New Jersey law does not preclude plaintiffs from seeking punitive damages in failure-to-warn, strict products liability cases), *and Cinnaminson Township Bd. of Educ. v. U.S. Gypsum,* 552 *F.Supp.* 855 (D.N.J. 1982) (New Jersey law clearly allows recovery of punitive damages in strict products liability cases). Nor will we dictate trial tactics for the plaintiffs' bar. A plaintiff who succeeds in proving the willful, egregious conduct that will support punitive damages is one who surely could have proved negligent, or intentional, tortious conduct. A decision to rely only on strict liability to establish liability of a defendant is a matter of strategy well within the discretion of counsel.

Defendant argues that allowing proofs of a defendant's misconduct in a strict liability case invites the risk of confusing juries. Presumably the fear is that jurors will be unable in their evaluation of the strict liability claim to disregard whatever evidence there may be of defendant's misconduct, and hence will be unable to return a fair verdict. The fear is unfounded. Our faith in the jury system is greater than the argument suggests. Juries are often called on to consider alternative theories and to conduct deliberations in stages, as when given interrogatories or a special verdict sheet. See *Rule* 4:39–2, *Rule* 4:39–1. We are confident that a careful charge, clearly explaining the elements necessary for each finding, can assist juries in reaching fair verdicts on both the liability phase and, should they reach the question, punitive damages in a failure-to-warn, strict products liability case.

Finally, we note that today's decision puts New Jersey in line with the many other jurisdictions that have considered the "incompatibility" of strict liability and punitive damages: they are virtually unanimous in finding them compatible. We supplement the impressive list of authorities marshalled by Judge

Pressler in 193 *N.J.Super.* at 122–23 with the following: *Jackson v. Johns-Manville Sales Corp.,* 781 *F.*2d 394 (5th Cir.), *cert.* denied, — *U.S.* —, 106 *S.Ct.* 3339, 90 *L.Ed.*2d — (1986) (Mississippi law); *Cathey v. Johns-Manville Sales Corp.,* 776 *F.*2d 1565 (6th Cir.1985) *cert.* denied, — *U.S.* —, 106 *S.Ct.* 3335, 90 *L.Ed.*2d — (1986) (Tennessee law); *Hale v. Firestone Tire & Rubber Co.,* 756 *F.*2d 1322 (8th Cir.1985) (Missouri law); *Hansen v. Johns-Manville Prods. Corp.,* 734 *F.*2d 1036 (5th Cir.1984), *cert.* denied, — *U.S.* —, 105 *S.Ct.* 1749, 84 *L.Ed.*2d 814 (1985) (Texas law); *Palmer v. A.H. Robins Co.,* 684 *P.*2d 187 (Colo.1984); *Johns-Manville Sales Corp. v. Janssens,* 463 *So.*2d 242 (Fla.Dist.Ct.App.1984), review denied, 467 *So.*2d 999 (Fla.1985); *United School Dist. No. 490 v. Celotex Corp.,* 6 *Kan.App.*2d 346, 629 *P.*2d 196 (1981); *cf. Robinson v. Audi NSU Auto Union Aktiengesellschaft,* 739 *F.*2d 1481 (10th Cir.1984) (Oklahoma law) (in strict products liability suit proof of actual damages is prerequisite to punitive damages).

## III

Having determined that no theory of law forecloses the award of punitive damages in a failure-to-warn, strict products liability action, we turn to the policy concerns that defendant poses as obstacles to our decision. Our discussion applies to asbestos mass-tort litigation, inasmuch as it is in that context that defendant chooses to present the issue.

One characteristic of this kind of litigation is that it occurs years after the exposure to asbestos, and hence long after the underlying tortious conduct that creates liability. Asbestos-related diseases generally have long latency periods. For example, asbestosis manifests itself ten to forty years after exposure, and pulmonary and bronchogenic carcinoma (lung cancer) typically occurs fifteen to thirty-five years after exposure.[2]

---

[2]Asbestosis is a progressive and incurable disease in which a scarring process initiated by the inhalation of asbestos fibers destroys air sacs in healthy lung

The remoteness of the tortious conduct spawns arguments that it would be inequitable to impose punitive damages in litigation that does not take place until years after the offending event. One such argument posits that changing social values render punishable conduct that would never have been punished at the time it occurred. Professor David Owen cautions against overlooking the prevailing moral and business standards of the time involved. Owen, "Problems in Assessing Punitive Damages Against Manufacturers of Defective Products," 49 *U.Chi.L.Rev.* 1, 13–14 (1982) (*Owen II*). In an earlier article Professor Owen grouped "manufacturer misconduct" into five categories: (1) fraudulent-type, affirmative conduct designed to mislead the public, (2) knowing violations of safety standards, (3) inadequate testing and quality-control, manufacturing procedures, (4) failure to warn of known dangers, and (5) post-marketing failures to remedy known dangers. *Owen I*, *supra*, 74 *Mich.L.Rev.* at 1329–61.

We do not perceive that any "changing social values" are implicated in this case, which we view as falling within Professor Owen's categories one and four. Punitive damages were available in this state well before James Fischer was exposed to asbestos. *See, e.g., Allen v. Craig*, 13 *N.J.L.* 294 (Sup.Ct.1833). We cannot imagine that the conduct proven in this case would have been viewed as any less egregious in the 1940's, when the exposure commenced, than it is today. In this connection we share the Appellate Division's reaction to defendant's "knowingly and deliberately * * * subjecting [James Fischer] as an asbestos worker to serious health hazards with utter and reck-

---

tissue, causing a decrease in pulmonary function and lung volume. Lung cancer caused by asbestos occurs in the lower lobes of the lungs and is, like asbestosis, incurable. Mesothelioma, another of the most common asbestos-related disabilities, is a malignant tumor of the membrane lining the lungs and the chest and abdominal cavities. It also is a latent disease, and is invariably fatal. Special Project, "An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation," 36 *Vand.L.Rev.* 573, 579 & nn. 10–12 (1983).

less disregard of his safety and well-being." 193 *N.J.Super.* at 131.

It is indeed appalling to us that Johns-Manville had so much information on the hazards to asbestos workers as early as the mid–1930's and that it not only failed to use that information to protect these workers but, more egregiously, that it also attempted to withhold this information from the public. It is also clear that even though Johns-Manville may have taken some remedial steps decades ago to protect its own employees, it apparently did nothing to warn and protect those who, like plaintiff, were employed by Johns Manville customers engaged in the manufacture and fabrication of asbestos products. [*Ibid.*]

Another concern created by the time gap between exposure and litigation is that the corporate personnel who made the decisions at the time of the exposure are no longer with the defendant company, possibly no longer alive. From this fact it is argued that punitive damages are inappropriate because they will not punish the true wrongdoers. But as many courts have observed, this contention ignores the nature of a corporation as a separate legal entity. See, *e.g., Johns-Manville Sales Corp. v. Janssens, supra,* 463 *So.*2d at 252; *Gogol v. Johns-Manville Sales Corp., supra,* 595 *F.Supp.* 971. Although the responsible management personnel may escape punishment, the corporation itself will not. "It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's liability." *Moran v. Johns-Manville Sales Corp.,* 691 *F.* 2d 811, 817 (6th Cir.1982). We are reminded that a primary goal of punitive damages is general deterrence—that is, the deterrence of others from engaging in similar conduct. *See* Mallor and Roberts, *supra,* 31 *Hastings L.J.* at 648–49. That purpose is, of course, well served regardless of changes in personnel within the offending corporation.

A related argument, which similarly ignores the legal nature of corporations, is that punitive damages unfairly punish innocent shareholders. This argument has been rejected repeatedly. *E.g., Wangen v. Ford Motor Co.,* 97 *Wis.*2d 260, 289, 294 *N.W.*2d 437, 453 (1980); *Martin v. Johns-Manville Sales Corp.,* 322 *Pa.Super.* 348, 365–69, 469 *A.*2d 655, 664–65 (1983), rev'd on other grounds, 508 *Pa.* 154, 494 *A.*2d 1088 (1985). It is the

corporation, not the individual shareholders, that is recognized as an ongoing legal entity engaged in manufacturing and distributing products. True, payment of punitive damages claims will deplete corporate assets, which will possibly produce a reduction in net worth and thereby result in a reduction in the value of individual shares. But the same is true of compensatory damages. Both are possible legal consequences of the commission of harmful acts in the course of doing business. To the same extent that damages claims may affect shareholders adversely, so do profitable sales of harmful products redound to their benefit (at least temporarily). These are the risks and rewards that await investors. Also, we would not consider it harmful were shareholders to be encouraged by decisions such as this to give close scrutiny to corporate practices in making investment decisions.[3]

Another characteristic of asbestos litigation is found in the startling numbers that reflect the massive amount of litigation generated by exposure to asbestos. Although we are mindful of the fact that the case before us involves one worker, whose exposure to asbestos caused legally compensable injury to him and his wife—it is not a class action, not a "mass" case—nevertheless we would be remiss were we to ignore the society-wide nature of the asbestos problem. Recognizing the mass-tort nature of asbestos litigation, we address the concerns that that characteristic of the litigation brings to a decision to allow punitive damages.

Studies show that between eleven million and thirteen million workers have been exposed to asbestos. Special Project, "An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation," 36 *Vand.L.Rev.* 573, 580 (1983). More than 30,000 lawsuits have been filed already for damages

---

[3]The expectation is not unrealistic. Although it surely is not the province of this opinion to express any view on the merits of the phenomenon, we note the wide-scale withdrawal of invested funds from companies doing business in South Africa—an expression of public reaction to apartheid.

caused by that exposure, with no indication that there are no more victims who will seek redress. Of the multitude of lawsuits that are faced by asbestos defendants as a group, Johns-Manville alone has been named in more than 11,000 cases. New claims are stayed because Johns-Manville is attempting reorganization under federal bankruptcy law. *In re Johns-Manville Corp.*, 26 *B.R.* 420 (Bankr.S.D.N.Y.1983).

Defendant argues that the amount of compensatory damages assessed and to be assessed is so great that it will effectively serve the functions of punitive damages—that is, defendants are more than sufficiently punished and deterred. We are not at all satisfied, however, that compensatory damages effectively serve the same functions as punitive damages, even when they amount to staggering sums. Compensatory damages are often foreseeable as to amount, within certain limits difficult to reduce to a formula but nonetheless familiar to the liability insurance industry. Anticipation of these damages will allow potential defendants, aware of dangers of a product, to factor those anticipated damages into a cost-benefit analysis and to decide whether to market a particular product. The risk and amount of such damages can, and in some cases will, be reflected in the cost of a product, in which event the product will be marketed in its dangerous condition.

Without punitive damages a manufacturer who is aware of a dangerous feature of its product but nevertheless knowingly chooses to market it in that condition, willfully concealing from the public information regarding the dangers of the product, would be far better off than an innocent manufacturer who markets a product later discovered to be dangerous—this, because both will be subjected to the same compensatory damages, but the innocent manufacturer, unable to anticipate those damages, will not have incorporated the cost of those damages into the cost of the product. All else being equal, the law should not place the innocent manufacturer in a worse position

than that of a knowing wrongdoer. Punitive damages tend to meet this need.[4]

Defendant argues further that the cumulative effect of punitive damages in mass-tort litigation is "potentially catastrophic." The Johns-Manville bankruptcy is offered as proof of this effect. We fail to see the distinction, in the case of Johns-Manville, between the effect of compensatory damages and that of punitive damages. The amount of punitive damages and the determination that they would cause insolvency that could be avoided in their absence are so speculative as to foreclose any sound basis for judicial decision. *See also Jackson v. Johns-Manville, supra,* 781 *F.*2d at 403 n. 11 ("defendants * * * do not indicate why their ability to pay future damage awards will be more affected by punitive damage awards than by the multiplicity of compensatory damage awards.").

Heretofore the typical setting for punitive damage claims has been the two-party lawsuit in which, more often than not, a punitive damages award was supported by a showing of some element of malice or intentional wrongdoing, directed by a defendant to the specific plaintiff. Even if the actual object of the malicious conduct was unknown to defendant, the conduct nevertheless was directed at a single person or a very limited group of potential plaintiffs.

Punishable conduct in a products liability action, on the other hand, will often affect countless potential plaintiffs whose identities are unknown to defendant at the time of the culpable conduct. We agree with the Illinois court that the mere fact that a defendant, "through outrageous misconduct, * * * manage[s] to seriously injure a large number of persons" should not relieve it of liability for punitive damages. *Froud v. Celotex Corp.,* 107 *Ill.App.*3d 654, 658, 63 *Ill.Dec.* 261, 264, 437

---

[4]In addition, it is questionable how much punishment is effected by compensatory damages alone, which are generally covered by liability insurance. We consider our observation in that regard to be valid despite a restricted insurance market and increasing insurance costs.

*N.E.*2d 910, 913 (1982), rev'd on other grounds, 98 *Ill.*2d 324, 74 *Ill.Dec.* 629, 456 *N.E.*2d 131 (1983).

Of greater concern to us is the possibility that asbestos defendants' assets may become so depleted by early awards that the defendants will no longer be in existence and able to pay compensatory damages to later plaintiffs. Again, it is difficult if not impossible to ascertain the additional impact of punitive damages as compared to the impact of mass compensatory damages alone.

Many of the policy arguments against punitive damages in mass tort litigation cases can be traced to *Roginsky v. Richardson-Merrell, Inc.*, 378 *F.*2d 832 (2d Cir.1967). The *Roginsky* court denied punitive damages to a plaintiff who suffered cataracts caused by MER/29, an anti-cholesterol drug. Although the denial of punitive damages rested on a determination that the evidence was insufficient to send the matter to the jury, the court expressed several concerns over allowing punitive damages for injuries to multiple plaintiffs. The fear that punitive damages would lead to "overkill" turned out to be unfounded in the MER/29 litigation. Approximately 1500 claims were made, of which only eleven were tried to a jury verdict. Punitive damages were awarded in only three of those cases, one of which was reversed on appeal. (*Roginsky, supra*, 378 *F.*2d 832.) *Owen I, supra*, 74 *Mich.L.Rev.* at 1324, 1330 n. 339. While we do not discount entirely the possibility of punitive damage "overkill" in asbestos litigation, we do recognize that the vast majority of cases settle without trial.

Accepting the possibility of punitive damage "overkill," we turn to means of addressing that problem. Because the problem is nationwide, several possible remedial steps can be effective only on a nationwide basis, and hence are beyond our reach. One such solution is the setting of a cap on total punitive damages against each defendant. *E.g., Owen II*, 49 *U.Chi.L.Rev.* at 48–49 & n. 227. Such a cap would be ineffective unless applied uniformly. To adopt such a cap in New

Jersey would be to deprive our citizens of punitive damages without the concomitant benefit of assuring the availability of compensatory damages for later plaintiffs. This we decline to do.

Perhaps the most likely solution to the problem of cumulative punitive damages lies in the use of a class action for those damages. *Froud v. Celotex Corp., supra,* 107 *Ill.App.*3d at 657–60, 63 *Ill.Dec.* at 264–65, 437 *N.E.*2d at 913–14. Several courts have recognized the need to streamline and consolidate issues that come up repeatedly in asbestos litigation. For instance, the non-availability of the state-of-the-art defense was decided in a consolidated case governing all asbestos cases in the federal district of New Jersey. *In re Asbestos Litigation,* 628 *F.Supp.* 774 (D.N.J.1986). Another federal district court certified a class of all plaintiffs in personal injury asbestos cases pending in the Eastern District of Texas, for purposes of determining both the availability of a state-of-the-art defense and punitive damages. *Jenkins v. Raymark Indus.,* 109 *F.R.D.* 269 (E.D.Tex.1985), aff'd, 782 *F.*2d 468 (5th Cir.1986), reh'g denied, 785 *F.*2d 1034 (5th Cir.1986)

Prerequisites to class certification under Federal Rule of Civil Procedure 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interest of the class.

Additional requirements include a finding that

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. [*Fed.R.Civ.P.* 23(b)(3).]

A mandatory class may be certified if

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest. [*Fed.R.Civ.P.* 23(b)(1).]

Several courts have recognized the usefulness of class certification in mass tort cases. *E.g., Jenkins v. Raymark Indus., supra,* 109 *F.R.D.* 269; *In re "Agent Orange" Product Liability Litigation,* 100 *F.R.D.* 718 (E.D.N.Y.) certif. den., 100 *F.R.D.* 735 (D.N.Y.1983) (class certified for affirmative defenses and causation issues, mandatory certification on punitive damages). Although some appellate courts have decertified classes in mass products liability actions, those same courts have nonetheless recognized the validity of the class action mechanism. The federal district court for the Eastern District of Pennsylvania certified a nationwide class of plaintiff school authorities in asbestos property damage cases. *In re Asbestos School Litigation,* 104 *F.R.D.* 422 (1984), rev'd, 789 *F.*2d 996 (3d Cir.1986). The class was mandatory for punitive damages and "opt-out" for compensatory damages. The Third Circuit acknowledged the possibility that the concerns generated by mass tort cases might justify certification of a mandatory nationwide class for purposes of punitive damages. 789 *F.*2d at 1005. The class was decertified, however, because certification rested on insufficient factual findings and the class was underinclusive, affecting neither personal injury claimants nor non-school property damage plaintiffs. 789 *F.*2d at 998, 1005–06. See also *In re Northern District of California, Dalkon Shield IUD Prods. Liability Litigation,* 693 *F.*2d 847 (9th Cir.1982), *cert.* denied, 459 *U.S.* 1171, 103 *S.Ct.* 817, 74 *L.Ed.*2d 1015 (1983) (hereinafter *Dalkon Shield* ) (nationwide class decertified because requirements of "typicality" and superiority of class action over individual adjudication not met). For a thoughtful analysis of the advantages and problems of resolving mass tort punitive damage claims through the class-action technique, see Seltzer, "Punitive Damages in Mass Tort Litigation," 52 *Fordham L.Rev.* 37, 61–92 (1983).

Defendants as well as plaintiffs can seek class certification. *See Dalkon Shield, supra,* 693 *F.*2d at 849 n. 2. In addition, the asbestos industry itself is free to—and has begun to—develop alternatives and supplements to federal class action. A step in this direction is the establishment of the Asbestos Claims Facility pursuant to the Wellington Agreement, an organization whose purpose is to establish expeditious and uniform settlement, payment, or defense of asbestos-related claims.[5]

At the state court level we are powerless to implement solutions to the nationwide problems created by asbestos exposure and litigation arising from that exposure. That does not mean, however, that we cannot institute some controls over runaway punitive damages. When a defendant manufacturer engages in conduct warranting the imposition of punitive damages, the harm caused may run to countless plaintiffs. Each individual plaintiff can fairly charge that the manufacturer's conduct was egregious as to him and that punitive damages should be assessed in his lawsuit. "Each tort committed by the defendant is individual and peculiar to that particular plaintiff who has brought suit." *Neal v. Carey Canadian Mines,* 548 *F.Supp.* 357, 377 (E.D.Pa.1982), aff'd *sub nom. Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 *F.*2d 481 (3d Cir.1985). Nonetheless, there should be some limits placed on the total punishment exacted from a culpable defendant. We conclude that a reasonable imposition of those limits would permit a defendant to introduce evidence of other punitive damage awards already assessed against and paid by it, as well as evidence of its own financial status and the effect a punitive award would have. We note with approval that this approach has already been looked on with favor by our trial courts. See

---

[5]It is also possible that the needs of future plaintiffs will be attended to, as to defendants in bankruptcy, by innovative procedures in the federal Bankruptcy Courts, such as reduced priority for punitive damages claims as a condition of a reorganization plan.

*Brotherton v. Celotex Corp.*, 202 *N.J.Super.* 148, 163 (Law Div.1985).

We realize that defendants may be reluctant to alert juries to the fact that other courts or juries have assessed punitive damages for conduct similar to that being considered by the jury in a given case. Although the evidence may convince a jury that a defendant has been sufficiently punished, the same evidence could nudge a jury closer to a determination that punishment is warranted. That is a risk of jury trial. The willingness to accept that risk is a matter of strategy for defendant and its counsel, no different from other strategy choices facing trial lawyers every day.

When evidence of other punitive awards is introduced, trial courts should instruct juries to consider whether the defendant has been sufficiently punished, keeping in mind that punitive damages are meant to punish and deter defendants for the benefit of society, not to compensate individual plaintiffs.

A further protection may be afforded defendants by the judicious exercise of remittitur. Should a trial court determine that an award is "manifestly outrageous" or "grossly excessive," *Cabakov v. Thatcher, supra,* 37 *N.J.Super.* at 260, it may reduce that award or order a new trial on punitive damages. In evaluating the excessiveness of challenged punitive damage awards, trial courts are expressly authorized to consider prior punitive damage awards.

## IV

Defendant argues that even if punitive damages are allowed in strict products liability, mass tort actions, they should not have been assessed against Johns-Manville in this action. We disagree.

We hold that punitive damages are available in failure-to-warn, strict products liability actions when a manufacturer is (1) aware of or culpably indifferent to an unnecessary risk of

injury, and (2) refuses to take steps to reduce that danger to an acceptable level. This standard can be met by a showing of "a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg v. Reaction Motors, supra,* 37 *N.J.* at 414. Judge Brody's charge at the trial level incorporated the elements necessary to satisfy this standard. The trial court described the conduct necessary to warrant the imposition of punitive damages as "intentionally inflicting harm or acting in such a gross, wanton way, such a terrible way, so recklessly in disregard of what might happen to someone * * *." This language amply conveyed the requisite level of conduct, and, for purposes of this case, may be deemed the equivalent of the *Berg* case's formulation, adopted above.

Judge Brody alerted the jury, at the very outset of the charge, that plaintiffs' claims for punitive damages "involve considerations which in some respects are quite different from your concern with respect to compensatory damages." This careful approach was adhered to throughout the charge. The court informed the jury of the purposes of compensatory damages and admonished the jurors not to use punitive damages to compensate the plaintiffs. It reminded the jury on more than one occasion not to consider defendant's conduct for purposes of assessing compensatory damages. The charge was more than sufficient to protect the legitimate interests of the defendant.

We have set forth in considerable detail the evidence presented to the jury in support of the punitive damages claim, *supra* at 648–651. The voluminous exhibits, answers to requests for admissions, answers to interrogatories, correspondence, and testimony on oral depositions fully justify the Appellate Division's appraisal of the "proofs respecting Johns-Manville" as "indeed [ ] overwhelming." 193 *N.J.Super.* at 117. We are satisfied that a jury could reasonably have concluded that defendant was guilty of deliberate acts or omissions "with

knowledge of a high degree of probability of harm and reckless indifference to the consequences." *Berg v. Reaction Motors, supra,* 37 *N.J.* at 414. In particular, the evidence supports a finding that Johns-Manville knew of the dangers created by its product. Not only did it fail to warn users of the serious health hazards associated with exposure to asbestos, it actually took affirmative steps to conceal this information from the public. These actions fully warranted the jury's imposition of punitive damages.

## V

Even though defendant challenged neither the trial court's charge to the jury nor the amount of punitive damages awarded in this case, we consider those issues of sufficient importance to warrant the following comments as a guide in future cases.

Because product safety is the paramount concern of products liability law, it is indifference to or disregard of the dangers posed by the product in its defective state that should be the key factor in justifying an award of punitive damages in a failure-to-warn, strict products liability action. When punitive damages are sought as part of a failure-to-warn claim, the court must be especially cautious in instructing the jury regarding the elements that define each and the evidence that may be considered in support of, on the one hand, strict products liability and, on the other, the damages that that liability can support by way of punishment of the defendant manufacturer or distributor of the defective product. The jury must not be misled into believing that the distinct elements of either are a requirement of or necessarily relevant to the other.

The purpose and nature of punitive damages must be carefully explained to the jury. In determining whether a defendant's conduct was sufficiently egregious to justify punitive damages, fact-finders should consider the seriousness of the hazard to the public; the degree of the defendant's awareness of the hazard and of its excessiveness; the cost of correct-

ing or reducing the risk; the duration of both the improper marketing behavior and its cover-up; the attitude and conduct of the enterprise upon discovery of the misconduct; and the defendant's reasons for failing to act. See *Owen I, supra,* 74 *Mich.L.Rev.* at ——; *Thiry v. Armstrong, supra,* 661 *P.*2d at 519; *Gryc v. Dayton-Hudson,* 297 *N.W.*2d 727, 739 (Minn.), *cert.* denied, 449 *U.S.* 921, 101 *S.Ct.* 320, 66 *L.Ed.*2d 149 (1980).

If a fact-finder decides to award punitive damages, additional considerations can guide a determination of the appropriate amount. Punitive damages should bear some reasonable relationship to actual injury, but we have consistently declined to require a set numerical ratio between punitive and compensatory damages. *Nappe, supra,* 97 *N.J.* at 50; *Leimgruber, supra,* 73 *N.J.* at 457–58. The reasonableness of the relationship of punitive damages to actual injury must be considered in light of other factors in each case. For example, some particularly egregious conduct may generate only minimal compensatory damages. In such cases higher punitive damages would be justified than when substantial compensatory damages are awarded. The profitability of the marketing misconduct, where it can be determined, is relevant. Other factors to be considered include the amount of the plaintiff's litigation expenses, the financial condition of the enterprise and the probable effect thereon of a particular judgment, and the total punishment the enterprise will probably receive from other sources.

Finally, there looms the question of the quality of proof required to sustain a punitive damages award. Our dissenting colleagues urge adoption of a "clear and convincing" standard to replace New Jersey's traditional "preponderance of the evidence" rule. The dissent makes a persuasive argument to support such a change and has cited policy considerations that deserve careful consideration.

However, the fact remains that the parties have not briefed or argued that issue, nor have the courts below addressed it.

So significant a shift in our law should come, if at all, only after it has been fully litigated. Under the circumstance we are content to leave for another day the definitive resolution of so portentous a question.

Judgment affirmed.

O'HERN, J., dissenting.

But for its decision not to have the jury in this case consider the punitive damages claims in light of the principles it suggests today, I would join the opinion of the Court. With the exception that I believe that the jury should be clearly convinced that the proofs measure up to the standard, I find myself in basic accord with the Court's emphasis on the need to instruct juries on the purposes of punitive damages, the consideration of proportion in an award, the nature of conduct to be sanctioned, and the effect of prior awards in their deliberations. I also agree with the Court's recognition of the importance of possible class disposition. I am also in accord with the Court's view that the manufacturer's conduct here would meet its test of " 'utter and reckless disregard of [the user's] safety and well-being,' " *ante* at 661 (quoting 193 *N.J.Super.* 113, 131 (App.Div.1984)), or my own view of the test as involving "a conscious and outrageous indifference to the risks of marketing, manufacturing, or producing its product." *Infra* at 679. I find in the conduct a conscious indifference to the worker's well-being.

Still, whatever may be our views of the conduct involved, the parties should have the issues resolved in accordance with principles of broad application. Hence I choose to express my modest disagreement with the comprehensive and instructive guidance provided in the majority opinion, which guidance will, in itself, do much to advance the future resolution of these issues.

On another occasion I have expressed my views about the relationship of punitive damages to modern tort law. *See*

*Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 97 *N.J.* 37, 54–64 (1984) (O'Hern, J., concurring). I am occasioned to repeat many of those concerns here.

Since an early premise of punitive damages was that "one purpose of large awards was to prevent dueling," Note, *Exemplary Damages in the Law of Torts*, 70 *Harv.L.Rev.* 517, 522 (1957) (footnote omitted), this doctrine bears careful scrutiny. In this context of products liability, I would root an award of punitive damages in its remaining valid purpose: respecting and insuring the dignity of the individual. Failure to shape the doctrine to modern tort law has caused it to fall into disrepute and prompted the call for abolition of punitive damages, particularly in the products-liability context.[1] I continue to believe that a correctly structured doctrine of punitive damages can serve the interests of society. I express here the standards and guidelines that I believe necessary to deal effectively with punitive damages in the context of mass-exposure, products-liability litigation. To do so I must first review the purposes of the doctrine and its relation to our doctrine of products liability.

Punitive damages are said to be assessed in addition to compensatory damages to punish a defendant for the commis-

---

[1] New Jersey Assembly Bill No. 2401, as well as other measures introduced on May 5, 1986, concerns changes in the collateral source rule, punitive damages awards, product liability actions, and joint and several liability. On the federal side, S. 1999, A Bill to Regulate Interstate Commerce by Providing for a Uniform Product Liability Law and For Other Purposes, is in the Senate Committee on Commerce, Science, and Transportation. California's voters have adopted Proposition 51 to curtail punitive-damages claims against municipalities. *See Cal.Civ.Code* §§ 1431, 1431.1–1431.5 (adopted in June 3, 1986, primary election) (cited in *Brown v. Superior Court*, 182 *Cal.App.*3d 1125, 1144 n. 5, 227 *Cal.Rptr.* 768, 780 n. 5 (1986)). Justice Rehnquist has noted that "a significant number of American jurisdictions refuse to condone punitive damages awards." *Smith v. Wade*, 461 *U.S.* 30, 59, 103 *S.Ct.* 1625, 1642, 75 *L.Ed.*2d 632, 653 (1983) (Rehnquist, J., dissenting); *see also Product Liability Act: Hearing Before the Subcommittee on the Consumer of the Committee on Commerce, Science, and Transportation*, 99th Cong., 1st Sess. 27–29 (1985) (availability of punitive damages); *id.* at 94, 103 *S.Ct.* at 1659 (increased difficulty of obtaining punitive damages under S. 100).

sion of an aggravated or outrageous act of misconduct and to deter the defendant and others from such conduct in the future. *See Leimgruber v. Claridge Assocs.*, 73 *N.J.* 450, 454 (1977); *see also* Owen, *Punitive Damages in Products Liability Litigation*, 74 *Mich.L.Rev.* 1257, 1277–87 (1976) (examining the functions of punitive damages and their applicability to products-liability litigation). Tort law developed as an adjunct to criminal law; therefore, it was natural to include punishment and deterrence among its objectives. 1 F. Harper & F. James, *The Law of Torts* § 1.3, at 8 (1956). Punitive damages were thus one means by which early society sought to control injurious behavior that grossly violated accepted norms.

Punitive damages were originally associated with dignatory torts and outrageous acts to another's reputation. The case that comes to mind concerning a person's honor is one in which one person physically insults another, but without injury, thereby humiliating the victim. *See Kiser v. Neumann Co. Contractors, Inc.*, 426 *S.W.*2d 935, 938 (Ky.1967). This notion of insult within the primitive doctrine of punitive damages would be expanded well beyond its original purpose and would be largely irrelevant if applied to modern consumer-products-liability law.

As noted, the classic punitive-damages claim arises from a single incident involving two parties, making it possible for a single jury to determine an appropriate punishment without considering the possibility of additional sanctions by other juries. Furthermore, punitive damages have always been appropriately recognized when there was no adequate recovery for a legal wrong. *Huckle v. Money*, 95 *Eng.Rep.* 768 (1763) (exemplary damages appropriate where King's constable wrongfully detained plaintiff). The "sense of outrage and insult" encompassed in injuries inflicting emotional distress has been one of the driving forces in the development of punitive damages awards. *Symposium Discussion—The History of Punitive Damages*, 56 *S.Cal.L.Rev.* 155, 155 (1982). Our law may provide recompense for such injury in the form of emotion-

al suffering, provided that there is a sufficient nexus between the actor and the injured individual. *Portee v. Jaffee*, 84 *N.J.* 88, 98–99 (1980). With this as background, we approach the modern mass-exposure, products-liability case.

## A. PUNITIVE DAMAGES ARE INAPPROPRIATE IN ORDINARY STRICT PRODUCTS–LIABILITY CASES

The history of punitive damages demonstrates that there is a strong doctrinal inconsistency in permitting a punitive-damages claim in an action based upon strict products liability. *See* Tozer, *Punitive Damages and Products Liability*, 39 *Ins. Couns.J.* 300, 301 (1972). In a long series of cases, summarized in *O'Brien v. Muskin Corp.*, 94 *N.J.* 169 (1983), this Court outlined its view of the purposes of strict products-liability law. First, the underlying purpose is a shared concern about the proper allocation of the risk of loss upon all parties in the stream of commerce, *id.* at 181–84; second, strict liability is imposed in part to relieve plaintiff's sometimes overwhelming burdens of proof, *id.* at 179; and third, central to our analysis of strict tort liability is the premise that it is the condition of the product that determines liability, not the conduct of the manufacturer, *id.* at 180; *see also Feldman v. Lederle Laboratories*, 97 *N.J.* 429, 450 (1984) ("[E]mphasis of the strict liability doctrine is upon the safety of the product, rather than the reasonableness of the manufacturer's conduct. It is a product-oriented approach to responsibility"). In *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229 (1981), the Court emphasized that even in failure-to-warn cases, the manufacturer's liability is predicated not on the manufacturer's conduct but on the safety of the product:

> [O]nly safe products should be marketed—a safe product being one whose utility outweighs its inherent risk, provided that risk has been reduced to the greatest extent possible consistent with the product's continued utility. [*Id.* at 238 n. 1.]

One of the judicial benefits of strict liability is the simplification of proof in complex tort litigation. *See, e.g., Beshada v.*

*Johns-Manville Prods. Corp.*, 90 *N.J.* 191, 209 (1982) ("salutary goals of [imposing strict liability include] increasing product safety research and simplifying tort trials"). Hence, in the asbestos context a central goal of *Beshada* is undermined if not lost entirely when each trial invites reexamination of what the asbestos industry knew about the product and when, rather than the safety of the product. *See* Brodeur, *Annals of Law— the Asbestos Industry on Trial, The New Yorker* (June 10, 1985–July 1, 1985). As noted, one of our goals in adopting strict liability was to meet the changing needs of society and to "eas[e] the burden of proof for a plaintiff injured by a defective product, a policy that is achieved by eliminating the require- ment that the plaintiff prove the manufacturer's negligence." *O'Brien v. Muskin Corp., supra,* 94 *N.J.* at 179 (citing Keeton, *Product Liability and the Meaning of Defect,* 5 *St. Mary's L.J.* 30, 34–35 (1973)). In a cause of action based upon a theory of strict liability we focus upon the product itself and not whether defendant "knew or should have known of the harmful attributes of its product while the product was under its control in order to charge it with that knowledge * * *. Once the product is deemed dangerous, the defendant's lack of fault is irrelevant." *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386, 394–95 (1982) (citations omitted). Since the conduct of the manufacturer is largely irrelevant, in the ordinary strict liabili- ty case punitive damages are inappropriate.

B.  PUNITIVE DAMAGES ARE APPROPRIATE IN CER- TAIN CASES INVOLVING MASS EXPOSURE TO HIGHLY DANGEROUS SUBSTANCES OR MATERI- ALS

Notwithstanding that punitive damages are inappropriate in strict products-liability cases, there may be cases involving incidents of mass exposure to unsafe products that are so outrageous that they call for a societal imposition of sanctions that do more than just make the victims whole. I would

recognize punitive damages in certain circumstances, such as
mass-exposure, hazardous-substance cases, where the conduct
of the manufacturer constitutes such an outrageous affront to
the individual that punishment is necessary. In doing so, the
modern use of punitive damages would be conformed to its
ancient relationship to dignatory torts.

In so ruling, a court must develop an analytical framework to
identify those cases in which the assessment of punitive dam-
ages is appropriate and to provide guidance for trial and
appellate courts. I would hold that: (1) punitive damages
should be based upon a finding that the actions of a manufac-
turer exhibit a conscious and outrageous indifference to the
risk that its product may be excessively dangerous to consum-
ers; (2) the factfinder must base this determination on clear
and convincing evidence of such indifference; (3) juries must be
carefully instructed of the measure of damages with specific
standards that should relate to the unconscionable profit real-
ized by the outrageous acts of the manufacturers; and (4)
courts should, whenever possible, resolve the common question
of liability for punitive damages at an early stage of the
litigation as a class action.

### (1) *The Standard for Imposition of Punitive Damages*

"The concept of punitive damages embodies a rule for individ-
ualized punishment of a wrongdoer whose conduct toward the
plaintiff is particularly outrageous." *Collins v. Eli Lilly Co.*,
116 *Wis.*2d 166, 202, 342 *N.W.*2d 37, 54, *cert. denied sub nom.*
*E.R. Squibb & Sons, Inc. v. Collins*, —— *U.S.* ——, 105 *S.Ct.*
107, 83 *L.Ed.*2d 51 (1984). If the manufacturer displays such a
conscious and outrageous indifference to the risks of market-
ing, manufacturing, or producing its product, then punitive
damages should be awarded. This indifference should equate
with something more significant than "willful and wanton"
conduct, a concept that our law has not sharply defined. *See*

*Krauth v. Israel Geller*, 31 *N.J.* 270, 277 (1960).[2] I recognize that the use of any verbal formula does not convey with unerring accuracy the concept that we wish to impart. To this extent, we are trapped in the language of the law. Commentators have pessimistically characterized such verbal variations as "negligence 'with the addition of a vituperative epithet,' " Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 *S.Cal.L.Rev.* 1, 36 (1982) (quoting *Wilson v. Brett*, 152 *Eng. Rep.* 737, 739 (Ex.Ch.1842)).

Still we must try to give content to the phrase that we choose to impart the degree of failure of conduct that will warrant imposition of the sanction of punitive damages.

I believe that the phrase conscious indifference to the risks of marketing the product will convey the requirement that the manufacturer was aware of the risk at the time the product was marketed. This concept conveys an indifference to human values that I regard as essential to the imposition of punitive damages. "[T]he thing that outrages the juries in those cases is precisely the notion of the defendant manufacturer supposedly using consumers in the instrumentalist fashion for dollars." *Symposium Discussion, supra*, 56 *S.Cal.L.Rev.* at 158. Such conduct is an insult to the personal well-being of the victim equivalent to that which prompted the early development of the doctrine. Punitive-damages awards are acceptable when the indifference and disregard exhibited by the manufacturer, who sees the consumer as a human test laboratory, constitute an affront to the dignity of the individual. *See, e.g., Grimshaw v. Ford Motor Co.*, 119 *Cal.App.*3d 757, 174 *Cal.Rptr.* 348 (1981) ($3,500,000 punitive-damages award, which had been reduced from $125 million, upheld for marketing Ford Pinto

---

[2]In some contexts, we have employed this concept but have sharply limited it to situations in which a jury is dealing with average human behavior and canvassing ordinary conduct that is well within the norm of everyday experience. *Mahoney v. Carus Chem. Co.*, 102 *N.J.* 564 (1986) (firemen's rule); *see also Foldi v. Jeffries*, 93 *N.J.* 533, 549–50 (1983) (parental·immunity).

with inherently dangerous gas tank when avoidance would have involved minimal costs).

I agree with the majority that in a products-liability action the concept of election of remedies does not preclude the imposition of punitive damages. In such an action, the plaintiff is *relieved* of the *burden* of proving knowledge of the dangerous propensity of the product, *Freund v. Cellofilm Properties, Inc., supra,* 87 *N.J.* at 244, but is not precluded from demonstrating in the risk-utility analysis that the manufacturer made a conscious choice to expose users to an unreasonable risk of harm that could have been avoided or minimized with a slight burden to the utility of the product.

In presenting the differing standards of conduct to a jury a court will confront some difficulties, but such difficulties will not be insurmountable.

### (2) *The Quality of Proof Required*

Since awarding punitive damages in a products-liability case has such serious consequences, the burden of proof must reflect the gravity of the decision. Standards of proof are devices of the law that guarantee that the public will have confidence in the integrity of the decision. *Santosky v. Kramer,* 455 *U.S.* 745, 757, 102 *S.Ct.* 1388, 1396, 71 *L.Ed.*2d 599, 609 (1982). In assessing exemplary damages, common-law juries are asked to fulfill one of the most solemn roles of society, that of punishing its members. "[P]articularly careful scrutiny" is warranted when punitive damages are allowed. *Roginsky v. Richardson-Merrell, Inc.,* 378 *F.*2d 832, 852 (2d Cir.1967). "Three jurisdictions have recently modified their punitive damages laws to provide that punitive damages may be awarded only if the plaintiff has proved by 'clear and convincing evidence' that the defendant acted with the requisite culpability. * * * [Another state] requires that plaintiffs prove their punitive damages claims beyond a reasonable doubt." Wheeler, *The Constitutional Case for Reforming Punitive Damages*

*Procedures,* 69 *Va.L.Rev.* 269, 296–97 (1983) (footnotes omitted). I believe that a party seeking punitive damages in this context should prove the requisite " 'outrageous' conduct by clear and convincing proof." *Acosta v. Honda Motor Co.,* 717 *F.*2d 828, 839 (3d Cir.1983) (interpreting Virgin Islands law in absence of any existing precedent); *accord Wangen v. Ford Motor Co.,* 97 *Wis.*2d 260, 297, 294 *N.W.*2d 437, 457 (1980); *Model Uniform Prod. Liab. Act* § 120(A), *discussed in* 44 *Fed.Reg.* 62,748 (1979). If society is to have confidence that under the circumstances the sanction is warranted, this standard of proof is necessary in awarding punitive damages.

(3) *Standards and Measures for the Award of Punitive Damages*

Historically, courts have been loath to inquire into the amount of jury verdicts for punitive damages. The inability or unwillingness of courts to deal with standards for punitive damages is a residue of the early history of common law. It was "at comparatively a recent period that the jury has relinquished its control over actions even of contract, and that any approach has been made to a fixed and legal measure of damages." T. Sedgwick, *A Treatise on the Measure of Damages* 214 (1847), *quoted in* M. Horwitz, *The Transformation of American Law, 1780–1860,* at 83 (1977). Only by degrees was the principle recognized " 'that the amount of compensation [was] to be regulated by the direction of the court, and that the jury cannot substitute their vague and arbitrary discretion for the rules which the law lays down.' " Horwitz, *supra,* at 83 (quoting Sedgwick, *supra,* at 214). "The doctrine of exemplary damages is thus seen to have originated in a survival in this limited class of cases of the old arbitrary power of the jury." 1 T. Sedgwick, *A Treatise on the Measure of Damages* § 349, at 689 (9th ed. 1912). Appellate records are replete with evidence that judges desperately seek guidance on this issue in instructing juries. Note, *Exemplary Damages in The Law of Torts, supra,* 70 *Harv.L.Rev.* at 529–30; *see also* Note, *The Expand-*

*ing Availability of Punitive Damages in Contract Actions,* 8
*Ind.L.Rev.* 668, 672 (1975) (lack of ascertainable standards
responsible for reluctance of courts to interfere with punitive
damages awards). I believe that guidance can be given to
juries in their instructions. Instructions can include identifica-
tion and examination of the recurring forms of marketing
misbehavior that have been considered most deserving of pun-
ishment, such as fraudulent misconduct, knowing violations of
safety standards, inadequate testing and manufacturing proce-
dures, and failure to warn of known dangers before marketing
as well as post-marketing failure to remedy known dangers.
*See* Owen, *Punitive Damages In Products Liability Litiga-
tion, supra,* 74 *Mich.L.Rev.* at 1329–52, 1369–70.

In addition to marketing misbehavior, juries should balance
society's interests against the defendant's interests. Factors to
consider include the severity of threatened harm, the degree of
reprehensibility of defendant's conduct, the profitability of the
conduct, the financial condition of the enterprise, the amount of
compensatory damages assessed, the cost of litigation, the
potential criminal sanctions, and other civil actions against the
defendant based on the same conduct.

In this way, trial courts could give greater content to the
framework within which a jury should assess punitive damages.
The jury should be instructed about the purposes of the doc-
trine, which do not include giving plaintiffs a windfall; that in
products-liability cases recovery of punitive damages should be
based upon the extent to which the manufacturer's marketing
conduct exhibits a conscious or reckless indifference to the risk
that its product may be excessively dangerous to consumers;
that the jury's imposition of sanctions should serve to shape the
manufacturer's conduct to reflect its concern for human values
without diminishing the utility of the mass-produced merchan-
dise. Furthermore, one of the underlying, unwritten premises
of awarding punitive damages is that plaintiffs are often under-
compensated by compensatory damages. Expenses of litiga-
tion, counsel fees, and expert fees are extremely high and

burden plaintiffs. A candid recognition of this issue would be consistent with reality. Finally, some consideration of the relationship of an award of punitive damages to an award of compensatory damages is appropriate and should be brought to the jury's attention. *Nappe, supra,* 97 *N.J.* at 55–57 (O'Hern, J., concurring).

### (4) *Management of Punitive Damages in Multi-Party Litigation*

The remaining issue, although not raised below, concerns how to resolve the problem of punitive damages in multiple-lawsuit, multi-party litigation. The basic principles of justice—that claimants be treated fairly, that litigation must come to an end, and that a party cannot be repeatedly sued on the same cause of action—are violated by excessive multiple punishments.

Punitive damages may be inappropriate in situations where numerous plaintiffs file suit against the same defendant for damages arising out of a single "mass disaster." Long, *Punitive Damages: An Unsettled Doctrine,* 25 *Drake L.Rev.* 870, 887 (1976). First, one plaintiff can collect a substantial award, thereby affecting another who may be equally deserving of such an award. Second, punitive damages are to "reflect the total penalty which must be imposed to punish and deter the defendant." *Bartolo v. Boardwalk Regency Hotel Casino, Inc.,* 185 *N.J.Super.* 534, 545 (Law Div.1982) (citing *Leimgruber v. Claridge Assocs., supra,* 73 *N.J.* at 454). Third, courts should not relitigate identical issues or inflict repeated punishment for the same offense. Finally, by determining punitive damages on a case-by-case basis, courts are consuming their judicial resources.

In order to avoid such problems, whenever possible, all punitive-damages claims should be pursued together in one class action. *See* Putz & Astiz, *Punitive Damage Claims of Class Members Who Opt Out: Should They Survive?,* 16 *U.S.F.L. Rev.* 1, 29–31 (1981); *see also* Morris, *Punitive Damages in*

*Tort Cases,* 44 *Harv.L.Rev.* 1173, 1194 (1931) ("When a defend-
ant's conduct results in harm to more than one plaintiff there
are no difficulties if there is but one suit"); *Roginsky v.
Richardson-Merrell, Inc., supra,* 378 *F.2d* at 839–40 n. 11.
("If there were any way in which all cases could be assembled
before a single court * * * it might be possible for a jury to
make one award to be held for appropriate distribution among
all successful plaintiffs").[3]

Such a resolution would call for a court to play a more active
role in the management of complex multi-party litigation of this
type. It is simply impossible for a legal system to approach
these problems in the way in which it previously considered
lawsuits between individuals. *See, e.g.,* Rosenberg, *The Causal
Connection in Mass Exposure Cases: A "Public Law" Vision
of the Tort System,* 97 *Harv.L.Rev.* 849, 852 (1984) (if "complex
damage actions against manufacturers of toxic agents are tried
under traditional methods of case-by-case adjudication, they will
likely consume hundreds of millions of dollars' worth of public
and private resources"); Trangsrud, *Joinder Alternatives in
Mass Tort Litigation,* 70 *Cornell L.Rev.* 779, 781–82 (1985)
("The perceived inefficiencies, costs, and delays associated with
mass tort litigation have provoked calls for reform * * * *").
Traditionally, courts that adjudicate the rights of many parties

---

[3]Those courts that have resisted class-action remedies have basically been
involved with cases that present problems of different laws not resolvable in
one forum. The rights of a Dalkon-Shield-IUD victim in California may differ
from the rights of one in Iowa. *In re Northern Dist. of Calif., Dalkon Shield
IUD Prods. Liab. Litig.* 693 *F.2d* 847, 852–54 (9th Cir.1982), *cert. denied sub
nom. A.H. Robins Co. v. Abed,* 459 *U.S.* 1171, 103 *S.Ct.* 817, 74 *L.Ed.2d* 1015
(1983). But why, for example, should a few Dalkon Shield users receive
several millions in punitive-damages awards, while others receive nothing
from the bankrupt A.H. Robins Co.? *See* Sugarman, *Doing Away with Tort
Law,* 73 *Calif.L.Rev.* 555, 602 (1985). The *Agent Orange* case demonstrated the
feasibility of applying a federal common law in certain situations. *In re "Agent
Orange" Prod. Liab. Litig.,* 100 *F.R.D.* 718, 724–26 (E.D.N.Y.1983), *mandamus
denied,* 725 *F.2d* 858 (2d Cir.), *cert. denied,* 465 U.S. 1067, 104 *S.Ct.* 1417, 79
*L.Ed.2d* 743 (1984); *but see In re School Asbestos Litig.,* 789 *F.2d* 996, 1005–07
(3d Cir.1986).

to litigation, as in bankruptcy, trusts and estates, or other institutional settings, have undertaken such roles.

The advantages of the class action would be many and varied. A class-action disposition would provide the most practical means of attacking the problems of mass-exposure litigation and punitive-damages claims. It would thus be possible to "determine the rights of a large group of similarly interested claimants in a single proceeding." *See* Seltzer, *Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control,* 52 *Fordham L.Rev.* 37, 63 (1983).

Unlimited multiple punishment for a single act "determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims * * * would violate the sense of 'fundamental fairness' that is essential to constitutional due process." *In Re Federal Skywalk Cases,* 680 *F.*2d 1175, 1188 (8th Cir.1982) (citing *Roginsky v. Richardson-Merrell, Inc., supra,* 378 *F.*2d at 838–41, and Putz & Astiz, *supra,* 16 *U.S.F.L.Rev.* at 29–31). By settling the punitive-damages issue in one proceeding, the defendant's entire liability would be determined, individual class claimants would receive a fair share of the sanction, and no further litigation of the issue would be needed.

Class actions would promote the legal system's productivity in dealing with mass-exposure litigation. The purpose of class treatment of viable mass-exposure claims would not be to reallocate resources, but rather to conserve them for more productive use by reducing litigation and administration costs, thus awarding more benefits to the victim. *See* Rosenberg, *supra,* 97 *Harv.L.Rev.* at 910.

The majority cites studies that "show that between eleven million and thirteen million workers have been exposed to asbestos." *Ante* at 663. Other studies indicate that in the last forty years, over 21 million Americans have been significantly exposed to asbestos. *See Jackson v. Johns-Manville*

*Sales Corp.*, 750 *F.*2d 1314, 1323 (5th Cir.1985). Not unexpectedly, more money is channelled to the expenses of litigation than to the expenses of the victims for recovery. Costs of adjudication in asbestos litigation total $1.59 to every $1 provided to a victim. Newman, *Rethinking Fairness: Perspectives on the Litigation Process* 7–8 (1984) (Thirty-ninth Benjamin N. Cardozo Lecture) (citing Kakalik, Ebener, Felstiner, Haggstrom & Shanley, *Variation in Asbestos Litigation, Compensation and Expenses* 89, Table 9.3 (Institute for Civil Justice, Rand Corp. 1984)).

As of January 1985, there were approximately 467 pending mass-exposure-asbestos claims in the United States District Court for the District of New Jersey. In the Superior Court of New Jersey there were approximately 1,316 personal-injury claims represented in 392 docketed asbestos cases venued in Middlesex County alone. Obviously, some of these docketed cases will be adjudicated before others. The class action would be fairer to all victims. Since punitive damages awarded in prior suits are a factor to be considered in determining the amount of such damages, *Bartolo v. Boardwalk Regency Hotel Casino, Inc., supra*, 185 *N.J.Super.* at 545 (citing 4 *Restatement (Second) of Torts* § 908 comment (e) (1979)), early litigators will be setting the trend by fixing money awards at the risk of victims who recover less later.[4] By allowing a class action in New Jersey, this Court would be promoting judicial economy by centralizing the litigation in the court that will adjudicate those primary issues related to the case. *In Re Federal Skywalk Cases, supra*, 680 *F.*2d at 1186. I would not represent that we can undertake to resolve the national problems of asbestos litigation. *See In re School Asbestos Litig.,*

---

[4] It is naive to assume that manufacturers would want to introduce evidence of this nature in the liability trial. Perhaps the issue can be considered separately or in judicial evaluation of the award.

789 *F.*2d 996, 1008 (3d Cir.1986) (certification of nationwide class of punitive-damages claims related to property losses overruled).  I also recognize that individual claimants have an important interest in separate trial of personal claims.

Still, this Court has recognized a duty to deal with mass-exposure litigation.  *Beshada v. Johns-Manville Prods. Corp., supra,* 90 *N.J.* 191;  *Gold v. Johns-Manville Sales Corp.,* 553 *F.Supp.* 482 (D.N.J.1982).  Resolution of mass-exposure litigation can best be achieved by narrowing the issues that must be litigated.

The justifications for imposing punitive damages include deterring outrageous conduct in the future, punishing such conduct, expressing society's disapproval of such outrageous conduct, and providing incentives for private civil enforcement.  Mallor & Roberts, *Punitive Damages: Toward a Principled Approach,* 31 *Hastings L.J.* 639, 647–50 (1980).  Class certification will achieve these goals.  In addition, class-action certification will save time and money for the parties and for the public and will help courts to resolve multiple lawsuits and to manage multi-party litigation in the punitive-damages setting.

In this case, because the trial court's charge to the jury was in terms of a mere preponderance of proof that the conduct of Johns-Manville met its test, and did not contain what I believe to be the necessary further definition of the appropriate standards for imposition of punitive damages, the judgment for punitive damages should be reversed and remanded for further proceedings.  I would invite consideration of certifying the punitive-damages claims for class disposition.

*For affirmance*—Justices CLIFFORD, HANDLER and POLLOCK—3.

*For reversal*—Justices O'HERN and GARIBALDI—2.