**MID–SOUTHERN TOYOTA, LTD. and Amco Industries, Inc., Appellants,**

**v.**

**BUG'S IMPORTS, INC., Appellee.**

Court of Appeals of Kentucky.

May 8, 1970.

Nelson D. Rodes, Jr., Lively & Rodes, Danville, Sidney Rosenfeld, Solomon, Bush, Rosenfeld & Elliott, Chicago, Ill., Joseph J. Leary, Squire N. Williams, Jr., Frankfort, for appellants.

James F. Clay, Clay & Clay, Danville, for appellee.

DAVIS, Commissioner.

Mid-Southern Toyota, Ltd., a wholly owned subsidiary of Amco Industries, Inc., is the distributor for Toyota cars in seventeen states, including Kentucky. It entered into a contract with Bug's Imports, Inc., of Danville, Kentucky, for the latter to act as warehousing agent for Toyota cars in Kentucky except in Louisville, Lexington, Elizabethtown, and Pleasure Ridge Park. Controversies arose and Bug's Imports brought action against Mid-Southern and Amco for a declaration of rights and for an order directing the defendants to cease and desist from certain alleged violations; however, no damages for alleged breaches were sought. The case was thoroughly litigated and judgment eventually was entered making various declarations, one of which was that Mid-Southern had breached the contract in certain respects, and the rest of which consisted of determinations of the meaning and effect of various parts of the contract, including the part relating to the duration of the contract. Mid-Southern and Amco have appealed, asserting numerous grounds of error, which we shall discuss after first stating the significant facts.

The contract was entered into on June 6, 1967, and was as follows:

"MUTUAL LETTER OF INTENT

The point of this agreement between Mid-Southern Toyota, Ltd., Chicago, Illinois, and Floyd Abbott, Jr., president of Bugs Imports, Inc., Danville, Kentucky, is to permit Bugs Imports, Inc., to act as warehousing agent for the Toyota line of automobiles in the state of Kentucky with exceptions as outlined below:

Louisville, Kentucky

Lexington, Kentucky

Elizabethtown, Kentucky

Pleasure Ridge Park, Kentucky

The duties of Mr. Floyd Abbott, Jr., Bugs Imports, Inc., as warehousing agent for Mid-Southern Toyota, Ltd., will be:—

1. To select dealers in the state of Kentucky to handle the Toyota line of automobiles in return for which Mid-Southern Toyota, Ltd., will give Floyd Abbott, Jr., Bugs Imports, Inc., the right to supply these dealers with Toyota cars. For his services Mid-Southern Toyota, Ltd., will give special pricing on all Toyota cars invoiced to Bugs Imports, Inc., on the following basis: $50.00 special advertising allowance invoiced per car, plus $50.00 matching amount by Mid-Southern Toyota, Ltd., making a total of $100.00 per car to be reimbursed upon Mid-Southern Toyota, Ltd.'s receipt of payment of drafts on cars invoiced.

 In the event that Mid-Southern Toyota, Ltd., directly supplies Toyota cars to one or any of the dealers appointed by Floyd Abbott, Jr., Bugs Imports, Inc., Mid-Southern Toyota, Ltd., will pay Floyd Abbott, Jr., Bugs Imports, Inc., a service commission of $50.00 per unit.

2. Floyd Abbott, Jr., Bugs Imports, Inc., will submit the following to Mid-Southern Toyota, Ltd., upon selection of a dealer to become an authorized Toyota dealer:

 A. Three (3) signed copies of the Mid-Southern Toyota, Ltd., franchise agreement.

B. One (1) copy of the Mid-Southern Toyota, Ltd., dealer application form.

C. Payment for parts, warranty data recorder (if needed), and 3′ by 5′ Toyota product sign submitted with the above papers. (See attached minimum price breakdown)

Mid-Southern Toyota, Ltd., reserves the right to reject dealer applications submitted by Floyd Abbott, Jr., Bugs Imports, Inc., for legal and valid reasons.

3. Floyd Abbott, Jr., Bugs Imports, Inc., agrees to stock an adequate supply of Toyota Cars to insure easy access by all dealers appointed to a regular car supply.

Mid-Southern Toyota, Ltd., will be wholly responsible as the factory authorized distributor for Toyota cars and parts to supply all dealers selected by Floyd Abbott, Jr., Bugs Imports, Inc., with parts, service assistance, and processing of warranty claims.

This agreement will run from this date, June 6, 1967, to June 5, 1968, a period of one (1) year. This agreement will be renewed at the end of this period providing Floyd Abbott, Jr., Bugs Imports, Inc., maintains a sales level in the area above outlined equal, percentage-wise, to the sales performance throughout the balance of Mid-Southern Toyota Ltd.'s territory.

Signed and agreed to this sixth day of June, 1967.

Mid-Southern Toyota, Ltd.
/s/ Edward R. Johnson
Vice President—Sales

Bugs Imports, Inc.
/s/ Floyd Abbott, Jr.
President"

---

Everything went well for the first six months; then, in January 1968, there was a change in management of Mid-Southern and Amco, and a new president took over. He promptly informed Bug's Imports that he intended to break and terminate the contract if there was any way to do it. Thereafter, difficulties were encountered by Bug's Imports in obtaining delivery of the quantity and types of cars ordered, and in obtaining approval of new dealers selected for expansion of the market. However, when the initial year of the contract expired on June 6, 1968, no assertion was made by either party that the contract had come to an end, and it was treated as having been renewed. The instant suit was brought by Bug's Imports in August 1968. The parties continued to operate under the contract while the suit was pending until late in December 1968, when Mid-Southern notified Bug's Imports that the former no longer would deal with the latter as a warehousing agent, but would ship its cars directly to the dealers. The judgment was entered on March 26, 1969.

The main provisions of the judgment are as follows:

"5. Bug's Imports has exclusive rights to distribute the Toyota line of automobiles in Kentucky with stated excepted territories, and unlimited rights to select retail franchise dealers in said territory subject only to a right in Mid-Southern Toyota to reject dealers for 'valid and legal' reasons.

6. Mid-Southern Toyota is legally bound to continue to furnish automobiles to Bug's Imports for delivery by it to franchise retail dealers, except in the excepted areas, so long as Bug's Imports maintains the required sales level, and Mid-Southern Toyota may not defeat Bug's Imports efforts to so maintain the required sales level by refusing to send Bug's Imports a sufficient supply of au-

tomobiles to permit it to so maintain such sales level.

7. Mid-Southern Toyota is bound under the agreement to rebate to Bug's Imports $100.00 for each unit delivered by it to a retail dealer outlet.

8. The provisions of the agreement purporting to allow Mid-Southern Toyota to supply automobiles directly to dealers in Bug's Imports' territory and pay a $50.00 commission per unit, is repugnant and so inconsistent with other provisions of the contract as to be ineffective.

9. The agreement concerned is a continuing one, conditioned only upon the failure of Bug's Imports to maintain the required sales level as set out in the agreement, with an equal obligation upon Mid-Southern Toyota to furnish Bug's Imports automobiles in sufficient numbers to permit it to comply with the agreement in this respect.

10. Bug's Imports has sold all cars received.

11. Mid-Southern breached the agreement in their refusal to make further deliveries of automobiles to Bug's Imports, and by making deliveries directly to the franchise retail dealers selected and established as retail agents by Bug's Imports, and further by their letter refusing to further deal with Bug's Imports as a warehousing agent for the territory alloted to it under terms of the agreement."

The appellants contend first that the circuit court should have refused to declare the rights of the parties since it was apparent that "the litigation between the parties would not be terminated" thereby. The appellants say that actions for damages, following the declaration, were contemplated and in fact have been commenced by the appellee. They point to KRS 418.065 that the court *may* refuse to declare rights where it would not terminate "the uncertainty or controversy." They place their own interpretation on this by substituting the word "litigation" in place of "uncertainty or controversy." We think they misconstrue the statute. It is plain from the statute as a whole that a declaration is not to be denied simply because it will not terminate *litigation;* in fact, the statute specifically contemplates that future litigation may follow the declaration. KRS 418.055 provides, "Further relief, based on a declaratory judgment, order or decree, may be granted * * * either in the same proceeding * * * or, in an independent action."

The appellant's second contention is that Paragraph No. 9 of the judgment is erroneous in declaring that the contract is a continuing one with no self-limitation of period. Coupled with this is the argument that the circuit court should not have made any declaration at all concerning the duration of the contract, because the pleadings did not seek any such declaration. We shall answer the latter argument first.

The original complaint alleged various violations of the contract by the appellants, mainly with respect to the approval of dealers, the imposing of unreasonable requirements on dealers, and discrimination in the delivery of cars. The judgment did not make a declaration as to any of the pleaded issues but rather made adjudications of an entirely different group of issues. It appears from the record that as the trial of the case progressed the real issues began to emerge and to replace the nominal, surface issues pleaded in the complaint; the parties recognized these issues and met them, and the whole litigation would have been of little value had not this happened. It seems to us that such is the very thing contemplated by CR 15.02, and that in declaratory judgment actions, where controversy and uncertainty are sought to be terminated, CR 15.02 should be applied with special liberality. So we conclude that it was proper for the court to make a declaration concerning the duration of the contract.

It will be observed that the concluding language of the contract is:

"This agreement will run from this date, June 6, 1967, to June 5, 1968, a period of one (1) year. This agreement will be renewed at the end of this period providing Floyd Abbott, Jr., Bugs Imports, Inc., maintains a sales level in the same area above outlined equal, percentage-wise, to the sales performance throughout the balance of Mid-Southern Toyota, Ltd.'s territory."

The appellants argue, first, that the contract is not ambiguous and that it provides for *one renewal only,* for one additional year. Failing that, they argue that the contract, under the majority rule of interpretation of distributorship contracts, is terminable after it has run for a *reasonable time.* See Annotation, 19 A.L.R.3rd 196. The appellee maintains that the evidence shows that the parties intended the contract to continue in full force, without limit of time, so long as appellee met the sales level, and that the provisions of the second paragraph of Clause No. 1 of the contract, for payments of $50 each for cars delivered directly to the dealers, was intended to continue even after the appellee might cease to operate.

█ We do not agree with the appellants' contention that the contract clearly provides for only one one-year renewal. Rather, the language tends to suggest that after the initial term of one year the contract shall be renewed indefinitely. In view of the nature of the business involved, of the contribution to be made by the appellee in lining up a dealer organization, and of the monetary investment required of the appellee to set up warehousing facilities, we think it could not reasonably have been intended by the parties to limit the contract to a two-year period. On the other hand, it is our opinion that the contract, considered in the light of the evidence of the parties' negotiations, is not to be construed as one continuing in perpetuity. The general rule is that a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract. 17A C.J.S. Contracts, § 398 p. 478. We find the language of contract here in issue to be somewhat equivocal, and we believe the case calls for the application of the rule, especially applicable to distributorship contracts, that the contract is terminable after a reasonable time. See Annotation, 19 A.L.R.3rd 196. We are directing that the judgment be changed so to declare.

█ In this connection we shall say that to construe the clause of the contract providing for a payment of $50 each for cars delivered directly to the dealers, as intended to apply only after the appellee ceased to operate the warehousing business, and as providing the appellee some kind of perpetual premium for having initially located dealers for the appellants, strikes us as being so extreme as not to be considered a reasonable construction. Bug's Imports is a corporation, and surely it could not have been intended that the corporation would receive *premiums forever.* We think the rational meaning of the provision is that so long as the warehousing arrangement continued in operation, *Bug's Imports could elect* that specific cars be delivered directly to a dealer rather than through the warehouse, in which case Bug's Imports would receive only $50 per car instead of $100. We agree with the contention of the appellants that the judgment, in Paragraphs Nos. 7 and 8, erroneously invalidates the $50 provision, and we are directing that the judgment be changed accordingly. We do not, however, agree with the appellants that *they* have an option at any time to deliver cars directly to the dealers, and that Bug's Imports does not have an *exclusive* right to handle all cars distributed in Kentucky except in the four excepted cities. In the latter regard we think Paragraphs Nos. 5 and 6 of the judgment are correct. The contract would be substantially meaningless if Bug's Imports were not granted exclusive territorial rights.

■ ·Appellants next contend that Paragraph No. 11 of the judgment, declaring that Mid-Southern had breached the contract by selling cars directly to the dealers, is erroneous because there was neither pleading nor proof that such sales were made. The appellants admit that in answers to interrogatories and requests for admissions they stated that such sales were made, but they maintain that the answers did not constitute *evidence* because they were not offered in evidence. They refer to Clay, CR 33, Comment No. 8, and Clay, CR 36.01, Comment No. 5, as authority for the proposition that admissions and answers to interrogatories must be introduced in evidence. The latter comment states only that admissions "should be" introduced in evidence, and the former comment states only that answers to interrogatories would not constitute *judicial admissions* unless introduced in evidence. Clearly, in the case of a *jury trial,* admissions and answers to interrogatories would not be evidence unless introduced as such, and normally it would seem the same should be true in case of a trial by the court without a jury. However, in the latter case the formal admission in evidence really has no significant purpose so long as the parties know that the court intends to consider the admissions or answers as evidence, and the parties are afforded the opportunity to make objections of inadmissibility. In the instant case it does not appear to what extent the parties knew the court intended to consider the admissions and answers as evidence, but the appellants do not suggest that the admissions and answers were in any respects inadmissible as evidence or that they would have made any objections to their admission. Accordingly, we cannot find any prejudice from the fact that the court treated the admissions and answers as evidence.

The next complaint of the appellants is that the judgment decides issues that were not pleaded and ignores the issues that were pleaded. We hereinbefore have answered that complaint in ruling on the argument that the judgment should not have made any declaration respecting the duration of the contract.

Finally, the appellant Amco Industries contends that the judgment is erroneous to the extent it imposes any obligations on Amco. The only specific reference in the judgment to Amco is in Paragraph No. 2, which recites that Amco and "its subsidiary, Mid-Southern Toyota, Ltd., are properly before the court, and this court has jurisdiction of all parties." In Paragraph No. 3 the judgment possibly may refer to Amco by inference, in stating that the contract entered into "between the parties" constitutes a legal and binding agreement "between the parties." The remaining portions of the judgment mention only Mid-Southern's obligations and violations.

■ Admittedly, Mid-Southern is a wholly owned subsidiary of Amco Industries. But from that fact alone Amco is not bound to perform Mid-Southern's contracts nor is it liable for breaches of those contracts by Mid-Southern. We find nothing in this record establishing a basis for imposing liabilities on Amco, and we think the judgment cannot fairly be construed as undertaking to do that. We construe Paragraph No. 3 of the judgment, in holding that the agreement is binding on the "parties," as meaning only those who are named as parties in the contract.

To the extent that the judgment (1) holds invalid the clause of the contract providing for $50 payments on cars directly supplied to dealers and holds that Mid-Southern must pay $100 for each car delivered directly to a dealer, even when done at the election of Bug's Imports, and (2) holds that the contract is without time limitations as to duration, it is reversed, with directions to enter judgment in conformity with this opinion. In all other respects the judgment is affirmed.

EDWARD P. HILL, Jr., C. J., and MILLIKEN, OSBORNE, PALMORE, REED, and STEINFELD, JJ., concur.

NEIKIRK, J., concurs in result only.