**Sheri BERRIER (Formerly Sheri Wakefield), Appellant,**

v.

**Lewis S. BIZER; and Bizer & Bizer Optometrists, d/b/a Bizer Enterprises, Ltd., a/k/a Dr. Bizer's Visionworld, Appellees.**

No. 1999–SC–0485–DG.

Supreme Court of Kentucky.

Sept. 27, 2001.

Jonathan C. Hardy, Louisville, Virginia M. O'Leary, Oakland City, IN, Counsel for Appellant.

Mark A. Smedal, Napier, Perkins & Smedal, Louisville, Counsel for Appellees.

Barbara D. Bonar, Wolnitzek, Rowekamp, Bender & Bonar, PSC, Covington, Counsel for Amicus Curiae Kentucky Employment Lawyers Association.

COOPER, Justice.

Appellant Sheri Berrier (formerly Wakefield) brought this action against Appellees Lewis S. Bizer and Bizer & Bizer Optometrists, d/b/a Bizer Enterprises, Ltd., a/k/a Dr. Bizer's VisionWorld (hereinafter "Bizer")[1] claiming that she was wrongfully discharged from her employment in violation of KRS 337.990(14), see KRS 446.070, and that she was discriminated against because of her pregnancy in violation of KRS 344.040(1). A Jefferson Circuit Court jury returned a verdict in favor of Bizer and judgment was entered accordingly. The Court of Appeals affirmed. We now reverse for a new trial because of the admission of hearsay evidence in the form of written summaries of interviews that were marked as exhibits and taken to the jury room for consideration during deliberations. Because this case is being remanded for a new trial, we will also address Berrier's claims of error with respect to (1) requests for admissions served on Bizer pursuant to CR 36.01; (2) evidence of alleged post-discharge retaliation; and (3) punitive damages.

Bizer employs approximately 500 persons at a number of optometry stores in the Louisville area. Berrier was employed as a dispenser[2] at the Preston Highway store from September 21, 1991 until she was discharged without notice on November 22, 1993. Berrier claims she was discharged because (1) her pregnancy required more work absences and rest breaks than her store manager, Barry Gallas, considered appropriate; and (2) she had complained to the Kentucky Labor Cabinet, Division of Employment Standards, that the store's "open" rest break policy violated KRS 337.365 ("[n]o employer shall require any employee to work without a rest period of at least ten (10) minutes during each four (4) hours worked"). A subsequent investigation by the Division of Employment Standards found that Bizer's rest break policy did not violate the statute. Bizer claims Berrier was discharged because of "gross misconduct," specifically, a November 10, 1993 verbal confrontation with Barry Gallas in the presence of employees and customers, characterized by Bizer as "blatant insubordination."

## I. HEARSAY: "WITNESS INTERVIEW" SUMMARIES.

Between June 13 and June 21, 1994, Bizer's attorney interviewed nine employees of Bizer's Preston Highway store with respect to the incidents leading up to Berrier's termination. He made handwritten notes during the interviews and reduced the notes to separate typewritten "witness interview" summaries. He then furnished

---

1. Bizer & Bizer Optometrists, d/b/a Bizer Enterprises, Ltd., is a limited partnership that can be sued in its common name. KRS 362.605. Dr. Jerry L. Bizer testified that the original partners were his father and his uncle, both now deceased, and that the business is now owned by him and his cousin, Lynn Bizer. The record does not identify who is/was Lewis S. Bizer.

2. A dispenser fits patients with eyeglasses and makes minor, comfort adjustments during follow-up visits.

each witness with a copy of her "witness interview" summary for suggestions or corrections. Most of the summaries were returned with handwritten notes or corrections added. Prior to the November 1997 trial, each witness was again given a copy of her "witness interview" summary to refresh her recollection. So far, so good. However, at the conclusion of the direct examination of each witness at trial, Bizer's attorney produced that witness's "witness interview" summary, had the witness authenticate it, and, over the continuing objection of Berrier's attorneys, introduced it into evidence as a marked exhibit. The jury was permitted to take these exhibits to the jury room for consideration during deliberations. We will not burden this opinion with the content of each "witness interview" summary or the manner in which it was authenticated and introduced into evidence. Typical, however, was the summary of the interview of Michele Logsdon, which provided as follows:

I met this date (June 13, 1994) with Ms. Michele Logsdon. Ms. Logsdon is employed at the Preston Highway street location of Dr. Bizer's Vision. She has worked for the Company for approximately five years; two and half years at Preston, one and a half years at Clarksville, and one and a half years at the Dixie Highway location. Wakefield [now Berrier] was at the Preston Highway location nearly the entire time that Ms. Logsdon was employed at that store.

Ms. Logsdon recalls that Wakefield was a trouble maker in her dealings around the store. She often made comments to co-workers about Barry Gallas. She didn't seem to like changes in procedures that Gallas had instituted. She advised her co-workers that they would be wasting their time to go to Barry Gallas to discuss business-related prob-

lems. In general, Wakefield was a drag on the morale of her co-workers.

Ms. Logsdon was not present during the "blow up" which occurred approximately two weeks prior to Wakefield's termination. However, she heard about the blow up from another frame stylist, Ms. Karchner. The blow up was a common topic of discussion among co-workers of Wakefield. The most common observation was the question of how Wakefield could get away with such behavior.

Concerning the wage and hour investigation, Ms. Logsdon recalled that it occurred at some point during the Fall. It seemed to be common knowledge on the part of everyone around the store that Wakefield had called the Wage and Hour Board. In fact, Ms. Logsdon overheard a comment Wakefield made to Ms. Connie Bruner wherein Wakefield asked if Bruner was going to "burn Barry's a—."

Ms. Logsdon recalled that generally very few people liked Wakefield. It was Ms. Logsdon's opinion that she should have been fired long ago and that she got away with too much insubordinate or other improper activity. For example, the "blow up" occurred in front of both co-workers and patients.

For some reason, Ms. Logsdon observed that Barry Gallas seemed to bend over backwards to accommodate Sheri. Even though Wakefield had animosity for Gallas, no personal animosity to Wakefield was shown by Gallas.

In particular, Ms. Logsdon did not notice any change of attitude by Barry Gallas or anyone else with respect to Wakefield after it was learned that she was pregnant. Ms. Logsdon recalled that Wakefield was granted lots of flexibility regarding prenatal needs. The

Company also attempted to accommodate Wakefield's doctor's appointments.

Wakefield's patient care was the subject of occasional patient complaints. One in particular was documented by Ms. Logsdon.

In essence, it appeared to Ms. Logsdon that Wakefield used her pregnancy to avoid the responsibilities of her job at the store. At one point, Wakefield went so far as to say that after she was pregnant she would likely go on AFDC and not return to work.

■ There are multiple reasons why the admission of this statement and its treatment as a trial exhibit requires reversal for a new trial. First, the statement contains numerous prejudicial assertions and opinions that were not repeated in Logsdon's sworn testimony at trial. Specifically, Logsdon did not testify that Berrier was a "trouble maker," or a "drag on the morale of her co-workers," or that Berrier "should have been fired long ago and that she got away with too much insubordinate or other improper activity." Nor did she testify that Berrier told her that "after she was pregnant she would likely go on AFDC and not return to work." Those statements were not the testimony of the witness, but statements attributed to the witness by Bizer's attorney. Logsdon was not asked if the contents of the summary were accurate, but only if she wished to change anything in the summary. The proscription in KRE 611(c) against asking leading questions on direct examination would have precluded Bizer's attorney from specifically asking Logsdon if Berrier was a "trouble maker," "a drag on morale," or "insubordinate," or otherwise putting words in her mouth. By introducing the "witness interview" summary, he accomplished much more. Not only was he able to introduce Logsdon's derogatory opinions of Berrier's workplace conduct without eliciting them directly from the witness, he was able to frame the evidence in his own words, not the witness's.

Even if the "witness interview" summary had been prepared by Logsdon, herself, it would have been hearsay, since it was an out-of-court statement offered to prove the truth of the matter asserted. KRE 801(c); *Fields v. Commonwealth*, Ky., 12 S.W.3d 275, 279 (2000). A hearsay statement of a non-party witness is admissible only if the statement is:

(1) Inconsistent with the declarant's testimony;

(2) Consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive; or

(3) One of identification of a person made after perceiving the person.

KRE 801A(a). Logsdon did not testify inconsistently with the contents of the "witness interview" summary and her testimony did not pertain to identification. Nor was there any express or implied charge that her trial testimony was recently fabricated or the product of improper influence or motive. In fact, the summary was introduced during the direct examination of Logsdon, not in rebuttal.

Bizer claims the summary was a "recorded recollection," KRE 803(5), offered to refresh Logsdon's memory. KRE 612. This argument confuses the concepts of "past recollection recorded" and "present memory refreshed." KRE 612 applies to the latter and permits the writing to be introduced only by the adverse party.

A writing used to refresh memory does not, through that process, acquire any status as evidence. It may not be introduced as such by the party using it to refresh memory and, as stated in one opinion, it "cannot be read under the

pretext of refreshing the recollection of the witness."

R. Lawson, *The Kentucky Evidence Law Handbook* § 3.20, at 162 (3d ed. Michie 1993) (quoting *Payne v. Zapp*, Ky., 431 S.W.2d 890, 892 (1968)). The resulting evidence is the product of the refreshed memory, not the writing used to refresh it; thus, the writing is not introduced into evidence and there is no involvement of the hearsay rule. Lawson, *supra*, § 8.85, at 500.

KRE 803(5) applies when the witness is unable to testify from present memory even after being exposed to the recorded recollection. In that instance, the recorded recollection is admissible, but only after verification of its accuracy. Lawson, *supra*, § 8.85, at 500. Even if admitted, "the memorandum or record may be read into evidence but may not be received as an exhibit unless offered by an adverse party." KRE 803(5). Regardless, all of the witnesses testified from present memory, thus, there was no need for the admission of any recorded recollections.

 The error in this case was compounded when the jury was permitted to take the "witness interview" summaries to the jury room for consideration during deliberations. Generally, a jury is not permitted to take even a witness's sworn deposition to the jury room. *Young v. State Farm Mut. Auto. Ins. Co.*, Ky., 975 S.W.2d 98, 99 (1998); *Louisville, H. & St. L. Ry. Co. v. Morgan*, 110 Ky. 740, 62 S.W. 736, 737 (1901); *Thompson v. Walker*, Ky.App., 565 S.W.2d 172, 174 (1978). The primary reason for the rule is that jurors may give undue weight to testimony contained in such a deposition and not accord adequate consideration to controverting testimony received from live witnesses. 75B Am. Jur.2d, *Trial* § 1671, at 454 (1992).

[B]ecause jurors may give undue weight to the testimony contained within a de-position which they take with them and may not accord adequate consideration to controverting testimony received from live witnesses, it is the universal rule that depositions may not be reviewed by a jury on an unsupervised basis.

*People v. Montoya*, 773 P.2d 623, 625 (Colo.Ct.App.1989); *see also Young v. State*, 645 So.2d 965, 966–67 (Fla.1994); *cf. Tibbs v. Tibbs*, 257 Ga. 370, 359 S.E.2d 674, 675 (1987). It is even worse to permit the jury to take with them to the jury room an unsworn statement of a witness, *e.g., State v. Poe*, 119 N.C.App. 266, 458 S.E.2d 242, 248 (1995), much less a summary of such prepared by the adverse party's attorney, that not only bolsters the witness's trial testimony but also contains facts and opinions to which the witness did not testify. For a similar case involving audiotapes of witness interviews, see *Mills v. Commonwealth*, Ky., 44 S.W.3d 366, 371–72 (2001). Bizer's claim of "harmless error" is belied by the prejudicial content of Logsdon's "witness interview" summary and the fact that similar summaries were introduced during Bizer's direct examinations of eight other witnesses.

## II. REQUESTS FOR ADMISSIONS.

 It would be an understatement to describe this litigation as "discovery rich." The clerk's record consists of 1,310 pages, much of it devoted to answers to interrogatories, requests for production of documents and for entry upon land, requests for admissions, and motions to compel responses to same. Early on, the trial judge granted Berrier's motion to exceed the discovery limits established in CR 33.01(3) (30 interrogatories and 30 requests for admission), but cautioned that the limits should not be exceeded by "too much." Berrier's first discovery request consisted of 63 interrogatories. The trial was sched-

uled for March 19, 1996. On or about January 23—24, 1996, Berrier served Bizer with 24 additional interrogatories, 49 requests for production of documents, 73 requests for admission, a demand to inspect Berrier's former workplace, and a demand to inspect the personnel files of eighteen former employees. The first issue regarding the requests for admission pertains to Bizer's failure to timely respond to the 73 requests. Civil Rule 36.01(2) provides, *inter alia:*

> The matter is admitted unless, within 30 days after service of the request, *or within such shorter or longer time as the court may allow,* the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter . . . . (Emphasis added.)

On February 19, 1996, Bizer moved for a ten-day extension of time to serve its responses. Berrier agreed to an extension until March 4, 1996 provided the trial was continued to a later date. Bizer agreed to the continuance. When the responses were not served by March 6, 1996, Berrier filed a motion that the requests be deemed admitted. On March 7, 1996, Bizer served the responses, admitting some of the requests and denying others. Some of the responses included explanations of the reasons for the admissions or denials. The trial judge overruled Berrier's motion that all 73 requests be deemed admitted.

Civil Rule 36.01(2) clearly vests the trial judge with discretion to shorten or lengthen the time limit for responding to requests for admission. *Rose v. Rawlins,* Ky., 358 S.W.2d 538, 540 (1962); *Naive v. Jones,* Ky., 353 S.W.2d 365, 367 (1961). The trial judge did not abuse his discretion by retrospectively approving the additional three-day extension of time for Bizer to respond to Berrier's requests.

The second related issue pertains to Berrier's motion to read to the jury Bizer's responses to the requests that were, in fact, admitted. The trial judge ruled that the responses could only be used to impeach Bizer's witnesses in the event they testified contrary to the matters admitted. Civil Rule 36.02 provides, *inter alia,* that "[a]ny matter admitted under Rule 36 is *conclusively established* . . . ." (Emphasis added.) "Conclusively established" means that the adverse party is not required to prove the matter admitted and the admitting party cannot introduce evidence to the contrary. *Lewis v. Kenady,* Ky., 894 S.W.2d 619, 621 (1994); *Lyons v. Sponcil,* Ky., 343 S.W.2d 836, 837 (1961); *Sims Motor Transp. Lines, Inc. v. Foster,* Ky., 293 S.W.2d 226, 229 (1956); *see also American Auto. Ass'n v. AAA Legal Clinic,* 930 F.2d 1117, 1120 (5th Cir.1991); *999 v. CIT Corp.,* 776 F.2d 866, 869–70 (9th Cir.1985). Since the admitting party is precluded from introducing evidence to the contrary, there can be no instance in which the matter admitted would be used for impeachment purposes. The issue is whether the admissions themselves are admissible as substantive evidence.

Civil Rules 32.01 and 33.02(1) provide that depositions and interrogatories can be used as evidence at trial, subject to the rules of evidence. Civil Rule 36 has no comparable provision, though at least one respected authority asserts that "[a]dmissions may be introduced as evidence." K. Philipps, 6 *Kentucky Practice: Rules of Civil Procedure Annotated* Rule 36.01, Comment 10, at 665 (5th ed. West 1995) (citing *Mid–Southern Toyota. Ltd. v. Bug's Imports, Inc.,* Ky., 453 S.W.2d 544 (1970)). *Mid–Southern Toyota,* however, only says that "[i]n the case of a *jury trial,* admissions and answers to interrogatories would not be evidence unless introduced as such . . . ." *Id.* at 550 (emphasis in original).

The issue there was whether the trial judge in a bench trial could consider responses to requests for admission that were in the clerk's record but had not been formally introduced as evidence at trial. The statement with respect to the introduction of admissions at a jury trial was *dicta* and provides no guidance with respect to whether or how the admissions are used as evidence.

Professor Lawson instructs that matters admitted under CR 36.01 are "judicial admissions," as opposed to "evidentiary admissions," and that the latter authorizes the introduction of evidence while the former eliminates the need for evidence. Lawson, *supra,* § 8.15, at 385.

> A judicial admission, on the other hand, is a *formal act* of a party (committed during the course of a judicial proceeding) that has the effect of removing a fact or issue from the field of dispute; it is conclusive against the party and may be the underlying basis for a summary judgment, directed verdict, or judgment notwithstanding the verdict.

*Id.* at 386 (emphasis in original). Finally, it is stated in *Sutherland v. Davis,* 286 Ky. 743, 151 S.W.2d 1021, 1024 (1941) that a natural consequence of a judicial admission is that it "allows the judge to direct the jury to accept the admission as conclusive of the disputed fact." However, neither Professor Lawson nor *Sutherland* addresses whether an admission can be read to the jury as substantive evidence. Thus, we turn our attention to other jurisdictions.

In the absence of a Fifth Amendment issue,[3] it appears that other jurisdictions have routinely permitted a party to read as evidence the other party's responses to requests for admissions. *E.g., Tapia v. City of Greenwood,* 965 F.2d 336, 339 (7th Cir.1992); *Schafer v. Barrier Island Station, Inc.,* 946 F.2d 1075, 1080 (4th Cir. 1991); *Hahn v. Atlantic Richfield Co.,* 625 F.2d 1095, 1097–98 (3d Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); *Rufo v. Simpson,* 86 Cal.App.4th 573, 103 Cal.Rptr.2d 492, 518 (2001); *Fischer v. Johns–Manville Corp.,* 103 N.J. 643, 512 A.2d 466, 469 (1986); *Parkway Hospital, Inc. v. Lee,* 946 S.W.2d 580, 587 (Tex.App.1997); *Lockheed Info. Mgt. Sys. Co. v. Maximus. Inc.,* 259 Va. 92, 524 S.E.2d 420, 432 (2000). In *Hahn v. Atlantic Richfield Co., supra,* a products liability case, the plaintiff was unable to procure the testimony of witnesses to prove the crucial fact that a sale had occurred, and his entire evidence on that issue consisted of reading to the jury the defendant's answers to interrogatories and responses to requests for admission. *Id.* at 1097–98. And it was held in *Mangan v. Broderick & Bascom Rope Co.,* 351 F.2d 24, 27–28 (7th Cir.1965), *cert. denied,* 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 846 (1966), that the trial judge committed reversible error by refusing to permit the defendant's responses to requests for admission to be read to the jury as substantive evidence.

The theory and purpose of Rule 36(a) [CR 36.01] is to provide an effective method whereby the parties to an action may interrogate each other to ascertain before trial what facts are in dispute between them. The intendment of that rule is that parties to litigation should not consume time at trial, or be put to

**3.** *Compare Kramer v. Levitt,* 79 Md.App. 575, 558 A.2d 760, 766–67 (1989) and *Wilson v. Misko,* 244 Neb. 526, 508 N.W.2d 238, 253 (1993) (judge to advise jury that responding party exercised his Fifth Amendment privilege in declining to respond) with *Gabriel v. Columbia Nat'l Bank,* 228 Ill.App.3d 240, 170 Ill.Dec. 120, 592 N.E.2d 556, 562 (1992) (the jury cannot be so advised).

expense in making proof of evidentiary, or ultimate facts appearing in a case that are not substantially contested.

*Jones v. Boyd Truck Lines,* 11 F.R.D. 67, 69 (W.D.Mo.1951).

We find these authorities persuasive and conclude that Berrier should have been allowed to introduce Bizer's responses to her requests for admission as substantive evidence at trial, subject to appropriate objections pursuant to the Kentucky Rules of Evidence. Because we are reversing this case for a new trial on other grounds, we need not decide whether this error, standing alone, would have been so prejudicial as to require reversal. KRE 103(a). Berrier does not claim that she was unable to otherwise prove the facts admitted in Bizer's responses, or that Bizer introduced evidence contrary to the admissions. On the other hand, proof of an admitted fact by witness testimony, which is always subject to disbelief and, thus, not conclusive of an issue, is an inadequate substitute for informing the jury that the issue has been removed from consideration by the adverse party's judicial admission. This is a matter of trial strategy best left to the good judgment of the party in whose favor the admission operates.

 The third and final related issue is Berrier's assertion that Bizer's explanations of the admissions should be extracted and the admissions read to the jury without the "extraneous language."

A party making response to requests for admissions of fact under Rule 36(a) [CR 36.01] is not deprived of the right to explain, clarify, or elucidate concerning the subject matter thereof. He may do so either in response made to the requests or by the examination or cross-examination of witnesses produced at trial.

*Knowlton v. Atchison, T. & S.F. Ry. Co.,* 11 F.R.D. 62, 66 (W.D.Mo.1951). Any other interpretation would permit the requesting party to require the responding party to admit or deny "half-truths." *Id.* Like a witness on cross-examination, a party responding to a request for admission is entitled to explain his/her answer.

## III. EVIDENCE OF POST–DISCHARGE RETALIATION.

The trial judge excluded Berrier's proffered evidence that Bizer unsuccessfully contested her claim for unemployment compensation, delayed payment of her accumulated vacation pay, and ordered her off the premises of the Preston Highway store on May 19, 1994, some six months after her discharge and one day prior to the filing of this action. The trial judge ruled, however, that either party could use the transcript of the evidence adduced at the unemployment compensation hearing for impeachment purposes.

### 1. Unemployment compensation claim.

In *Board of Education of Covington v. Gray,* Ky.App., 806 S.W.2d 400 (1991), the Court of Appeals held that the findings and conclusions reached in unemployment compensation proceedings are not res judicata and do not give rise to a claim of offensive collateral estoppel with respect to subsequent judicial proceedings arising out of the same incident. *Id.* at 403. We agree. The Restatement (Second) of Judgments § 83(3) (A.L.I.1982) provides that "[a]n adjudicative determination by an administrative tribunal does not preclude relitigation in another tribunal of the same or a related claim based on the same transaction if the scheme of remedies permits assertion of the second claim notwithstanding the adjudication of the first claim." The Commentary to Section 83(3) explains that the principle applies whether the issue is claim preclusion (res judicata)

or issue preclusion (collateral estoppel). *Id.*, Comment a.

▮▮▮ Furthermore, the issue before the unemployment commission was not whether Berrier was wrongfully discharged in violation of KRS 337.999(14)(a), but only whether she was involuntarily terminated without good cause. KRS 341.370. Thus, there could be no claim of res judicata because there was no identity of issues. *Newman v. Newman*, Ky., 451 S.W.2d 417, 419 (1970); *Williams v. Central Concrete, Inc.*, Ky.App., 599 S.W.2d 460, 461 (1979). Berrier asserts, however, that the unemployment referee's decision collaterally estopped Bizer from asserting that she was terminated for cause. Even if we were inclined (and we are not) to reject the principle enunciated in the Commentary to the Restatement (Second) of Judgments § 83(3), *supra*, collateral estoppel applies only if the party against whom it is sought to be applied had a realistically full and fair opportunity to litigate the issue, *Sedley v. City of West Buechel*, Ky., 461 S.W.2d 556, 559 (1970), and if principles of justice and fairness would be served by its application. *City of Covington v. Board of Trustees of the Policemen's and Firefighter's Ret. Fund*, Ky., 903 S.W.2d 517, 522 (1995). As pointed out in *Board of Education of Covington v. Gray, supra*, the informal procedures utilized in unemployment compensation proceedings do not afford "any party a full, true opportunity to litigate issues, or even encourage any meaningful participation in the process." *Id.* at 403. Bizer was not even represented by counsel at the referee's hearing on Berrier's claim for unemployment compensation.

An unemployment compensation hearing is designed to adjudicate promptly a narrow issue of law, and to grant a limited remedy to an unemployed worker. The use of an unemployment compensation decision to bind the parties in a subsequent ... action ... would be wholly inappropriate, and would frustrate the underlying purpose of ... collateral estoppel. If findings entered at an unemployment compensation hearing may be used to establish the employer's liability ... in a subsequent lawsuit, the employer would have a strong incentive to use its superior resources consistently to oppose a discharged employee's claim for unemployment benefits. Issues presented ... will be contested strongly, and the hearings will become lengthy and more detailed, and will no longer be suited to the prompt resolution of unemployment compensation claims. Judicial economy would be frustrated, rather than improved, as many unemployment compensation hearings become forums in which claims for unlawful or unconstitutional discharge are tried.

*Id.* (quoting *Salida School District R–32–J v. Morrison*, 732 P.2d 1160, 1165 (Colo. 1987)).

*2. Vacation pay.*

KRS 337.010(1)(c) includes "vested vacation pay" within the definition of "wages" and KRS 337.055 requires a terminated employee to be paid in full all wages earned by him/her not later than fourteen days following the date of dismissal. Bizer did not pay Berrier for her accumulated vacation pay until shortly after the expiration of the time for appeal from the decision of the unemployment referee.

▮▮▮ No Kentucky statute requires an employer to compensate an employee for accumulated vacation time. OAG 91–73. Nor is there an inherent right either to a vacation or to payment for unused vacation time. *Sweet v. Stormont Reg. Med. Ctr.*, 231 Kan. 604, 647 P.2d 1274, 1280 (1982). Vacation pay is purely a matter of contract between employer and employee. *Id.; Jackson v. Minidoka Irriga-*

*tion Dist.,* 98 Idaho 330, 563 P.2d 54, 59 (1977); *Wheeler v. Mission Elec. & Plumb. Supply, Inc.,* 267 Or. 209, 515 P.2d 1323, 1324 (1973); *see also Shannon v. Huntley's Jiffy Stores, Inc.,* 174 Ga.App. 125, 329 S.E.2d 208, 210 (1985); *Rose Acre Farms, Inc. v. Cone,* 492 N.E.2d 61, 67 (Ind.Ct.App.1986). Bizer's personnel policy manual, introduced as Defendant's Exhibit 47, contains the following provisions with respect to accumulated vacation pay:

> If a staffmember is terminated by Dr. Bizer's VisionWorld for cause under circumstances which would disqualify the staffmember from unemployment benefits, the staffmember shall not be eligible for any payment of vacation benefits.
>
> Any person terminated for gross misconduct will not be eligible for any accrued benefits including vacation benefits.

Whether these provisions mean that vacation pay does not vest until the moment of termination, or that vacation pay is subject to divestiture in the event the employee is terminated under either of the above circumstances, OAG 91–73, *supra,* the result is the same. Bizer was not required to pay Berrier her accumulated vacation pay at least until the conclusion of her claim for unemployment benefits.

*3. Exclusion from business premises.*

■■■ Berrier's only stated purpose for visiting the Preston Highway store on May 14, 1994, was to visit with her former co-workers. Bizer was within its rights to terminate what it regarded as an unauthorized disruption during business hours.

The trial judge correctly concluded that none of the three described post-discharge incidents tended to prove either of the two causes of action asserted in Berrier's complaint and amended complaint, *i.e.,* pregnancy discrimination and/or wrongful discharge for reporting an alleged wage and

hour violation. Bizer had a legal right to contest Berrier's unemployment compensation claim and a contractual right to withhold payment of her vacation pay pending the outcome of that contest. Bizer also had the right to preclude Berrier from loitering on its premises during business hours. Even if the proffered evidence tended to prove animus by Bizer against Berrier, we are unable to conclude that the trial judge abused his discretion in determining that the probative value of this evidence was substantially outweighed by its prejudicial effect. KRE 403; *Commonwealth v. English,* Ky., 993 S.W.2d 941, 945 (1999).

Berrier's reliance on *Robinson v. Shell Oil Co.,* 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), is misplaced. There, the plaintiff had filed a claim before the Equal Employment Opportunity Commission (EEOC) alleging that his discharge from his employment was racially motivated. During the pendency of the EEOC proceedings, the employer gave a negative reference to a prospective employer with respect to the employee. The employee then filed a separate action alleging retaliatory discrimination. *Id.* at 339–40, 117 S.Ct. at 845. The Supreme Court held that 42 U.S.C § 2000e–3(a) specifically authorizes a cause of action for post-discharge retaliation because of filing or participating in an EEOC claim. The statute provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding or hearing under this [Equal Employment Opportunities subchapter].

The Supreme Court interpreted "employees" to include "former employees" and Berrier asks us to give the same inter-

pretation to the term "employee" as used in KRS 337.990(14). "Employee" is defined in KRS 337.010(2)(a) as "any person employed by or suffered or permitted to work for an employer." Even if we were inclined to judicially expand that definition to include former employees, such would not benefit Berrier, because she has not alleged a separate cause of action for post-discharge retaliation. Compare *Kroger Co. v. Willgruber*, Ky., 920 S.W.2d 61 (1996), wherein the plaintiff brought separate causes of action for breach of his employment contract and intentional infliction of emotional distress, the latter premised upon events occurring after the termination of his employment. *Id.* at 62–63. Berrier has only alleged causes of action for wrongful discharge and pregnancy discrimination occurring prior to and at the time of her termination.

## IV. PUNITIVE DAMAGES.

■ The trial judge refused to instruct the jury on punitive damages. Generally, punitive damages are available in an action involving the termination of an at-will employee in violation of public policy. *Simpson County Steeplechase Ass'n v. Roberts*, Ky.App., 898 S.W.2d 523, 526 (1995); 82 Am.Jur.2d *Wrongful Discharge*, § 261 (1992); F. Dougherty, Annotation, *Damages Recoverable for Wrongful Discharge of At–Will Employee*, 44 A.L.R.4th 1131, 1155–59 (1986). Most of the cases collected in the A.L.R.4th annotation are discussed in *Simpson County Steeplechase Ass'n v. Roberts, supra,* at 526. Especially pertinent is *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221, 229 (1987), in which punitive damages were authorized where the employee was discharged in retaliation for filing an action for overtime wages. Nevertheless, there is no party remaining in this case against whom punitive damages can be assessed. KRS 411.184(3) provides:

In no case shall punitive damages be assessed against a principal or employer for the act of an agent or employee unless such principal or employer authorized or ratified or should have anticipated the conduct in question.

Kentucky is the only state with a statute that so broadly limits vicarious liability for punitive damages. Other states with similar statutes generally follow the Restatement approach, *i.e.:*

· Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) *the agent was employed in a managerial capacity and was acting in the scope of employment,* or

(d) the principal or a managerial agent of the principal ratified or approved the act.

Restatement (Second) of Agency § 217C (A.L.I.1957) (emphasis added). Minnesota's statute follows the Restatement model almost verbatim. Minn.Stat. § 549.20. Florida's statute imposes vicarious liability for punitive damages for acts condoned, ratified, or consented to by persons acting in a managerial capacity. Fla. Stat. Ann. § 768.72(3)(b). Alabama's statute does not specify that an employer is vicariously liable for punitive damages because of the acts of one employed in a managerial capacity, but does provide for vicarious liability if "the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master." Ala.Code § 6–11–27(a).

Although KRS 411.184(1)(c) was declared unconstitutional in *Williams v. Wilson*, Ky., 972 S.W.2d 260 (1998), the opin-

ion specifically did not purport to affect other provisions of the statute. *Id.* at 269. Berrier has not challenged the constitutionality of KRS 411.184(3).

■ The identity and status of Appellee Lewis S. Bizer is unknown. See note 1, *supra.* Bizer & Bizer Optometrists d/b/a Bizer Enterprises, Ltd., is a limited partnership in which Dr. Jerry L. Bizer and his cousin, Lynn Bizer, are the partners. Dr. Bizer testified that the day-to-day operations of the business are managed by David Carrig, Bizer's vice-president for operations, that he (Dr. Bizer) is not involved in personnel decisions, and that he did not even know of Berrier's termination until this action was filed. He professed to be unaware of any other instance in which a former employee claimed to have been discharged because of having made a wage and hour complaint or because of pregnancy. (David Carrig introduced a list of ninety-nine employees who were pregnant during the approximate time period of Berrier's employment; only Berrier was involuntarily terminated.) Carrig testified that he terminated Berrier upon the recommendations of Barry Gallas, the Preston Highway store manager, and Michael Super, Bizer's director of human relations; and that he did not consult with Dr. Bizer about that decision. Berrier did not contest any of this testimony. Carrig testified twice during the trial and, with respect to this issue, Berrier only asked him whether he was acting as Bizer's agent when he made the decision to terminate Berrier.

Berrier initially sued not only Bizer, but also Gallas, Super and Carrig. At the conclusion of her case-in-chief, Berrier dismissed with prejudice her claims against the three employees. Thus, at the conclusion of all the evidence, there was only a claim against the employer premised upon allegations of misconduct on the part of employees, and no evidence that the employer authorized or ratified the alleged misconduct or should have anticipated the conduct in question. Under that state of the facts, the trial judge correctly declined to instruct the jury on punitive damages.

Since KRS 411.184(3) precludes the imposition of punitive damages in this case, we do not address whether the language in KRS 344.450 that authorizes a civil cause of action in circuit court "to recover actual damages sustained" for sexual discrimination limits recovery under that statutory cause of action only to compensatory damages.

Accordingly, the decision of the Court of Appeals is reversed and this action is remanded to the Jefferson Circuit Court for a new trial.

LAMBERT, C.J.; GRAVES, JOHNSTONE, KELLER and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in result only without a separate opinion.